## Ike Bloom, Appellee, v. Bohemians, Inc., Appellant.

## Gen. No. 26,856.

1. MASTER AND SERVANT—*sufficiency of evidence in action for damages for inducing actor to quit employment.* In an action for damages based upon the action of defendant in inducing an actor to leave plaintiff's show suddenly while he was under contract for a further period and to enter defendant's employ, evidence examined and *held* sufficient to sustain a judgment in favor of plaintiff.

2. MASTER AND SERVANT—*when damages for inducing actor to quit employment are not excessive.* In an action for wrongfully inducing an actor to leave the employment of plaintiff in violation of his contract and to enter the employment of defendant, the amount of the judgment cannot be regarded as excessive where nearly the amount awarded is made up by the difference between the salary paid such employee and that paid the person engaged by plaintiff to take his place.

Appeal from the Municipal Court of Chicago; the Hon. SHERIDAN E. FRY, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1921. Affirmed. Opinion filed December 30, 1921. Rehearing denied January 10, 1922.

ZIMMERMAN, MACK & GARRETT, for appellant.

ADOLPH MARKS, for appellee.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

This is an appeal from a judgment for $200, rendered by the municipal court of Chicago on October 23, 1920, against the defendant in a tort action tried without a jury, resulting in the court finding the defendant guilty as charged and assessing plaintiff's damages at the sum of $200, upon which finding the judgment was entered.

It is alleged in plaintiff's statement of claim, in substance, that on or about July 28, 1920, one Charles Gash, a theatrical performer, was in plaintiff's employ in the "Midnite Frolics," a vaudeville show owned and produced by plaintiff at his place of amusement at Nos. 18-20 East 22nd Street, Chicago, in which show Gash played important parts; that on or about said date defendant wrongfully induced Gash to leave plaintiff's employ and enter into defendant's employ in connection with its show, called the "Greenwich Follies"; that defendant well knew at the time that Gash was in plaintiff's employ and that his contract with plaintiff had not expired; that by reason of defendant's unlawful acts plaintiff was compelled to and did employ another performer to take the place of said Gash, to whom plaintiff paid a larger salary; and that plaintiff has been damaged, etc. Defendant's affidavit of merits amounted, in substance, to a denial of liability on the part of defendant.

On the trial plaintiff was a witness in his own behalf and his testimony was supplemented by that of Charles Doll, his theatrical producer. Harry A. Bailey, manager of defendant, was called by plaintiff and cross-examined under section 33 of the Municipal Court Act [Cahill's Ill. St. ch. 37, ¶ 421]. Bailey was also called as a witness by defendant and his testimony was the only testimony offered by defendant.

Plaintiff testified, in substance, that his show, called "Midnite Frolics," started at midnight every night;

that on April 24, 1920, he employed Charles Gash, a
tenor singer and actor as one of the performers in
said show, and that Gash thereafter appeared every
night until July 28, 1920, when he did not then or
thereafter appear; that Gash was paid $75 a week; that
defendant was producing at the Studebaker theater,
Chicago, a show known as the ''Greenwich Follies,''
of which show one Sol. Abrams was the manager;
that prior to July 28, Abrams several times called at
plaintiff's place, heard and saw Gash sing and per-
form, and talked to plaintiff about him; that at one
of the conversations about the middle of the month of
July, Abrams said that ''We have been looking for a
good tenor for our new show'' and Gash evidently will
''fill the bill,'' and that plaintiff, in response to
Abrams' inquiry as to the salary paid Gash and as to
the length of plaintiff's contract with him, told
Abrams the amount, and that the contract had yet
''four or five weeks to run,'' and that when the ''con-
tract was up'' plaintiff would be pleased if defendant
hired Gash; that some days thereafter Gash told
plaintiff that he (Gash) was ''going with the Green-
wich Follies''; that shortly before Gash ceased per-
forming in plaintiff's show, plaintiff had another con-
versation with Abrams at which he said to Abrams,
''I understand you gave Gash $150 expense money to
go to New York and report there at once for a posi-
tion in New York in the Greenwich Follies,'' to which
Abrams replied, ''Well, what of it''; that plaintiff
then said that he had previously told him (Abrams)
about the contract with Gash and its expiration, and
that it was not just or right under the circumstances
for defendant to try to influence Gash to leave plain-
tiff's show, in which he was such a valuable asset, to
which Abrams replied, ''You can get a lot of tenors,''
and further said that Gash was going to New York
and into defendant's show there; that three or four
days after Gash ceased performing in plaintiff's show,

plaintiff had another conversation with Abrams at which he said to Abrams that defendant's actions had been unfair, that plaintiff's show had been upset and that he was going to demand damages of defendant, to which Abrams replied, "That's up to you; I am obeying orders; they told me to get this man and I got him"; that on the night of July 28 at 11:30 o'clock plaintiff first received definite notice that Gash would not appear that night in plaintiff's show, which had to be rearranged on that account; that for succeeding nights plaintiff told his producer, Chares Doll, to get another person to take Gash's place, and that a woman dancer and singer was engaged at a salary of $125 per week, and thereafter appeared in plaintiff's show.

Defendant did not call Abrams as a witness. Bailey's entire testimony was to the effect that he became manager of defendant's show at the Studebaker theater, Chicago, on Monday, July 26, 1920; that the show was owned by the defendant corporation, which had an office in New York City; that prior to said date Sol. Abrams acted as Chicago manager; that the witness first saw Gash performing at a "try-out" at said theater on an afternoon during the week before he became manager; that during the same week he visited plaintiff's show in company with Abrams and heard and saw Gash sing and perform; that he had a conversation with Gash shortly before July 28, 1920, at which time Gash told him he had no contract with plaintiff but was "working out there from week to week"; that at this time he was again "tried-out" and that members of the company "were very pleasant to him"; that the witness suggested that Gash might "go to New York and try-out" there, and that if he was found satisfactory he would probably be engaged.

In 26 Cyc. p. 1580, the general rule regarding interference by third persons with the relation of master and servant is stated to be: "A third person who wil-

fully entices a servant, knowing that he is in the employ of another, to quit such service is liable in damages to the master.'' And on pages 1582-3, it is said: ''An action for enticing away a servant is for a tort, and not for a breach of an implied contract.  *  *  * The measure of damages for enticing away the servant of another, who is hired for a definite time, is the actual loss sustained by the master.  *  *  * In a proper case exemplary damages may be awarded.'' In 15 Ruling Case Law, p. 45, sec. 4, in discussing the same subject, it is said:

''By the term 'servant,' within the meaning of the early common-law doctrine giving a right of action for the enticement of servants, was doubtless meant one who was engaged in menial service, that is, one living with the master as a member of his household or family.  *  *  * Gradually the rule was extended to comprise all cases in which the relation of service existed, even though the servant was not a member of the master's household.  *  *  * The leading case on this phase of the question is *Lumley v. Gye* (2 Ellis & Blackburn, 216), wherein, the action being brought for inducing an actress to break her contract with the plaintiff, malice being alleged and knowledge of the engagement also, the court held that the case came within the principles of the law as applied to cases of master and servant, the nature of the injury and the damage being the same and the supposed right of action in strict analogy; that it well applied to all cases where there was an unlawful and malicious enticing away of a person employed to give his personal labor or services for a given time under the direction of a master or employer, and that the principle extended to a case where the defendant maliciously procured a party, under a valid contract to give his exclusive personal service to the plaintiff for a specified period, to refuse to give such services during the period contracted for to the injury of the plaintiff.  *  *  * The English doctrine, as exemplified by *Lumley v. Gye* and the cases following it, has been very generally adopted in the United States.''

In the same textbook (pp. 46-48, secs. 5 and 7) it is said:

"The elements necessary to constitute enticement are existence, at the time when the inducements are to operate, of the service which the servant is induced to leave, knowledge thereof on the part of the defendant, and resulting injury to the master. In all such cases the plaintiff must of course show that the defendant acted maliciously, not in the sense of actual ill-will to the plaintiff, but in the sense of an act done to the apparent damage of another without legal excuse. The scienter or knowledge on the part of the defendant of the existence of the contract of employment is, therefore, regarded by the courts as supplying the element of malicious or unlawful motive necessary to make his act in enticing the servant a tort. * * * The courts are somewhat uncertain on the question as to what is a sufficient contract of employment, the enticement away from which will be ground for an action. The general rule is that in order to maintain such an action it must be shown that there existed at the time of the enticement an obligation on the part of the person enticed to render service to the plaintiff."

In the same textbook, in discussing the topic, "Interference with Contract Relations," it is said (pp. 53-54, secs. 13-14):

"In England the doctrine of *Lumley v. Gye* was accepted by the court of appeal in 1881. * * * In a case decided in 1880 (*Bowen v. Hall,* 50 L. J. Q. B. 305), Judge Brett * * * said: 'Merely to persuade a person to break his contract may not be wrongful in law or fact. But, if the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefiting the defendant at the expense of the plaintiff, it is a malicious act, which is in law and in fact a wrong act, and therefore a wrongful act, and therefore an actionable act if injury ensues from it.' * * * The theory of this doctrine is that a party to a contract has a property right therein which a third person has no more right maliciously to deprive him of, or injure him in, than he would to injure his property real or

personal, and that therefore such an injury amounts to a tort for which the injured party may claim compensation by an action in tort for damages. Under such circumstances to say that the injured party has his remedy against the other contracting party is in many cases offering a mere shadow for substance, for oftentimes the other party to the contract may be financially irresponsible. The contractual relation of master and. servant is still that with reference to which the rule here considered is most frequently invoked.''

Our attention has not been directed in the briefs filed by counsel to any case decided by the Supreme Court of this State, wherein were involved similar facts as those disclosed in the present case. In *Doremus v. Hennessy,* 176 Ill. 608, 616, the defendants were held liable for inducing certain persons named in plaintiff's declaration to terminate their contractual relations with her. The court quoted with approval the statement made in the opinion in the English case of *Bowen v. Hall, supra,* and further held that the question whether the injury and damage sustained by plaintiff resulted from the acts of the defendants, or from the independent acts of said persons named in her declaration, was one of fact. In *London Guarantee & Accident Co. v. Horn,* 206 Ill. 493, 507, it was decided that where a third party induces an employer to *discharge* his employee, who is working under a contract terminable at will, but under which the employment would have continued indefinitely in accordance with the desire of the employer except for such interference, and where the only motive moving the third party is a desire to injure the employee and to benefit himself at the expense of the employee, and where such right of action does not depend upon and is not connected with the continuance of such employment, a cause of action arises in favor of the employee against the third party.

From the testimony introduced on the trial of the

present case, we think that it sufficiently appears that the defendant, through its managers, Abrams and Bailey, wrongfully induced Gash on July 28, 1920, to suddenly leave the employ of plaintiff and not appear in plaintiff's show, in which Gash performed important parts; that the inducements were made for the indirect purpose of benefiting defendant at the expense of plaintiff; that at this time Gash was under a contract with plaintiff to continue his performance in said show, which contract had several weeks yet to run; that defendant, through its said managers, had knowledge at the time of these facts; and that plaintiff was damaged.

Under the law and under the facts we are of the opinion that the trial court was fully justified in entering the finding and judgment. The amount of the judgment cannot be regarded as excessive because nearly that amount is made up by the difference between the weekly salary paid Gash and the amount paid the woman singer and dancer, engaged by plaintiff after the departure of Gash to take his place in plaintiff's show.

The judgment of the municipal court is affirmed.

*Affirmed.*

BARNES and MORRILL, JJ., concur.