## Pure Milk Association, Plaintiff-Appellant, v. Kraft Foods Company, Defendant-Appellee.

### Gen. No. 10,819.

Second District.

September 27, 1955.

Additional Opinion, December 30, 1955.

Rehearing denied December 30, 1955.

Released for publication December 30, 1955.

Martin Burns, of Chicago, and Philip L. Keister, of Freeport, for appellant.

Louis A. Nack, of Galena, and Marshal Wiedel, of Chicago, for appellee; Nack & Nack, of Galena, and Snyder, Chadwell & Fagerburg, of Chicago, of counsel.

JUSTICE DOVE delivered the opinion of the court.
By this appeal, Pure Milk Association, a corporation, hereafter referred to as plaintiff or P.M.A., seeks to reverse a decree of the Circuit Court of Jo Daviess County dissolving a temporary injunction previously granted and dismissing its amended complaint for want of equity. The action sought to enjoin Kraft Foods Company from tortiously interfering with a certain contractual relationship existing between the

plaintiff and its dairy farmer members who deliver milk to the defendant and also sought to recover damages for inducing the members of the P.M.A. to breach their several contracts with the plaintiff.

The issues made by plaintiff's amended complaint and defendant's answer were submitted to the chancellor upon the pleadings and upon a stipulation of facts.

The plaintiff is a corporation organized under the provisions of the Agricultural Cooperative Act of Illinois, and the defendant is a Delaware corporation, licensed to transact business in Illinois and operates a factory at Stockton, Illinois, where it manufactures cheese from nongrade A milk which it purchases from dairy farmers residing in that area. Prior to the time this action was commenced, plaintiff had entered into marketing agreements herein referred to with approximately two hundred dairy farmers who live in the vicinity of Stockton and who were then customers of the defendant, selling to the defendant nongrade A or grade B milk. Within a few days after a dairy farmer entered into a marketing agreement with the plaintiff, the plaintiff notified defendant of this fact and gave defendant the name, address, milk can number, and certain other data concerning the producer and advised the defendant that such person was authorized to deliver milk to the defendant.

This marketing agreement executed by the plaintiff and by the producer refers to the producer of milk as "member" and recites that the member owns dairy cows and desires to have the milk from such cows sold by or through the plaintiff association. The agreement then provides: "(2) Member shall deliver all milk produced by him or under his control, to Association or such other person at such time and place and in such form and manner as shall be designated by Association. Milk consumed on the farm where produced is not included herein. (3) Association agrees to handle or market and sell in its natural or processed state all

104

milk so produced and delivered, in such form and manner as association deems best for the advantage of all persons signing agreements similar hereto and to blend the proceeds thereof with proceeds derived from milk delivered by other producers and establish returns therefor, in such manner as Association shall determine, giving consideration to quality, location of farm where produced and market in which the milk is sold. (4) Association shall pay or, at its option, authorize the buyer to remit to Member all money due for Member's milk less twenty-five cents (25¢) each year for a subscription to 'Pure Milk' and the amount determined by its Board of Directors as required for Association, which Member authorizes to be deducted and directs the buyer to pay to Association upon its demand. The amount deducted for Association shall be limited by resolution adopted at each regular annual meeting and may be limited by resolution adopted at any special meeting called for all members of Association. (5) Member gives Association full power and authority in its own name, to collect the entire amount due for milk delivered hereunder and Association guarantees payment to Member of all sums which are due under the terms hereof."

It was stipulated that during the period here involved the amount determined as required by the plaintiff, pursuant to the provisions of section four (4) of this agreement, was three cents per hundred weight of milk marketed by its members and that all the milk received by defendant from the plaintiff's members was nongrade A milk.

On June 29, 1953, the plaintiff wrote defendant as follows: "Following our uniform marketing agreement with dairy farmers, beginning with deliveries July 1 next and continuing until changed, kindly remit all money payable for non-grade A milk received from members of this association directly to this office. The names and addresses of members are enclosed, along

105

with copy of the contract in question. Names of other dairy farmers we direct to deliver milk to you will be sent along as contracts are accepted here in same manner we have done before. We will furnish you with a Pure Milk Association producer payroll form, a copy of which is enclosed, twice each month. We ask that you furnish us with price, patron weights, hauling rates and deductions for supplies, etc. which are customarily made by your plant. This information should be furnished us not later than the fifth and twentieth of the month immediately following the first and second half month delivery periods. Individual producer check to our member will be prepared and mailed from this office. Your cooperation in this and other matters will be appreciated. Copy of this letter is going forward to each member concerned with our letter to the group which is also enclosed for your information."

On the same day, June 29, 1953, the plaintiff wrote to each of its members delivering nongrade A milk to defendant as follows: "Because the Kraft Foods Company have refused to deduct check-off for Pure Milk Association, as authorized in your signed membership agreement, we have notified them to start to pay us for milk delivered by you starting with July 1st shipment. We, of course, in turn will pay you at regular prices less 3¢ per cwt. check-off on usual pay days." A copy of this letter was enclosed by plaintiff in its letter to defendant of the same date.

Instead of complying with this request to remit all money payable for milk received from members of the Association directly to the plaintiff, the defendant, on July 2, 1953, wrote its customers who were members of P.M.A. this letter:

"July 2, 1953

"Dear Patron:

"We find it necessary to write you regarding the most recent information received from the Pure Milk Association.

106

"According to the membership contract signed by some of our B patrons, members are committed to pay dues to the Pure Milk Association based upon all milk delivered to the Kraft plant at Stockton.

"The Pure Milk Association has requested us to deduct said dues (currently three cents per cwt.) from members' milk checks as such dues, and remit the funds deducted to them. After careful consideration, we have informed the Pure Milk Association officials that we prefer not to assume the responsibility and expense for this check-off of dues.

"The Association has advised us that they intend to enforce the clause in the contract requiring us to make payment to the Association for all milk delivered to Kraft by B members.

"For over forty years we at Stockton have valued the privilege of serving and working directly with our patrons, and we sincerely regret that this relationship must be changed in any respect.

"In order for us to comply with their wishes, it will be necessary for us to know if you intend to pay your P.M.A. dues directly to the Association, or if you want us to forward full payment of your milk to the Association. It will be appreciated if you will inform us which of these two methods you prefer. Please indicate your preference on the attached postal card and mail it to us as soon as possible.

> "Sincerely,
> "Kraft Foods Company
> H. W. PARKINSON
> Plant Manager"

The postal card referred to in this letter was as follows:

> "Kraft Foods Company—Stockton, Illinois
"Dear Sir:
"Effective with deliveries on and after 7–1–53:
"(. . . .) 1. I want to pay my PMA dues directly to PMA and continue to receive a

107

check from Kraft covering payment for my milk.

"(. . . .) 2. Please issue payment for my milk to the Pure Milk Association. I understand that I will receive a check covering payment for my milk from PMA.

"(Please check One)

"Name: ─────────────────────────
 (Sign Here)

"Address: ────────────────────────"

In response to this letter of the defendant, about one-half of plaintiff's patron members indicated they desired to pay their dues directly to P.M.A. and to continue to receive their milk check in full from defendant. The other one-half instructed the defendant to send their entire milk check to the plaintiff. Defendant followed the directions of its patrons in this respect and paid part of them directly and remitted to P.M.A. for those who desired their checks to be handled in that manner.

Following this correspondence, plaintiff filed the instant complaint on August 18, 1953, and thereafter, on January 14, 1954, its amended complaint. On February 24, 1954, the plaintiff sent to defendant 199 original contracts which it had entered into with dairy farmers in the Stockton territory. Accompanying these contracts was a letter from the plaintiff to the defendant in which it was stated: "These dairy farmers have delivered or are delivering milk to your plant in Stockton under and pursuant to the provisions of the respective agreements enclosed. When these contracts have served the purpose of notifying your company of the existence thereof please return for permanent filing in Association offices." These contracts were duly received by defendant and thereafter by it returned to the plaintiff.

 

Counsel for appellant insist that appellee had notice and knowledge of appellant's contracts with the dairy farmers from whom appellee received milk; that these contracts authorized appellant to collect from defendant the proceeds derived from the sale of this milk and were, in fact, assignments to appellant of the amounts indicated; that upon receipt of notice of these contracts and its provisions, appellee became liable to pay appellant the amounts so assigned to it—that is, either all money due for milk which appellee received from appellant's members or, at appellant's election, appellee was obligated to pay to appellant the amount of the checkoff, being three cents per cwt.; that appellee's refusal to recognize appellant's rights under these contracts and its transmission to appellant's members of the letters referred to encouraged those members to breach their agreements with appellant and amounted to a tortious interference by appellee with the contractual relationship existing between appellant and its dairy farmer members.

Appellee's position is that the membership agreements created a principal-agent relationship between plaintiff and its members, with the dairy farmer as the principal and appellant as the agent, and that when the plaintiff demanded from the defendant payment to it of all money due for milk which the defendant purchased from its dairy farmer patrons who had signed the membership agreement, defendant had no notice or knowledge of these membership agreements or their provisions, and because of the unusual nature of the demand made upon it by plaintiff, it felt required to inquire of its patrons who had signed such agreements concerning the existence of the agreement and the provisions thereof; that if the inquiry made by appellee influenced any dairy farmer to breach his contract with appellant, the defendant did not intend such an effect and, therefore, is not responsible. With reference to

109

the "check-off," appellee insists it was not obligated to make the same because of the expense, uncertainty, and hardship involved if it undertook to do so.

Prior to the time appellant entered into any contract with producers of milk in the Stockton area, these producers were selling their milk to appellee. Upon entering into a contract with a producer, appellant wrote appellee giving appellee the name and address of the new member, his contract and can number, and the effective date when the new member was authorized by appellant to deliver his milk to appellee. After the amended complaint was filed and almost four months before the case was heard by the chancellor, appellant sent to appellee 199 original contracts and advised appellee that the milk these contract producers were delivering to appellee was being delivered pursuant to the provisions of their several agreements with appellant. There is, therefore, no merit in appellee's contention that it had no notice or knowledge of these membership agreements or their provisions. Appellee knew that these contracts authorized appellant to collect from appellee the entire amount of money appellee became obligated to pay for the milk so received by it or, if appellant so elected, it was authorized to request appellee to remit to the member the entire amount of money appellee became obligated to pay for the milk so received less twenty-five cents each year for a subscription to "Pure Milk" and less the checkoff amounting to three cents per cwt. of milk.

What led to the filing of the instant complaint was the refusal of appellee to comply with appellant's request to make this checkoff by deducting three cents per cwt. and remit that sum to appellant, which appellee refused to do, followed by appellee's subsequent refusal to pay appellant the entire amount due from appellee for milk delivered to appellee by appellant's members.

The principal question which arises upon this record for our determination is whether appellee's letter of July 2, 1953, and its subsequent conduct constitute a wrongful interference with appellant's contract with its members. In answering that question, we will first determine whether appellee was warranted in refusing appellant's request to make the three cents per cwt. checkoff and then whether appellee was under any obligation to pay appellant the entire amount due for milk delivered to appellee by appellant's members.

In Pacific Mills v. Textile Workers' Union of America, Local No. 254, 197 S. C. 330, 15 S.E.2d 134, 135 A. L. R. 497, the plaintiff, Pacific Mills, sought to enjoin the defendant Union against the enforcement of an assignment by each of eleven hundred employees of the plaintiff, members of the defendant Union, who, by an appropriate instrument, had assigned to the Union $1.00 per month from his wages for work done or to be done by the member for the plaintiff, each employee having authorized and directed plaintiff, as employer, to pay the Union said amount. It appeared that the employer had entered into a contract with the Union, but the contract contained no "check-off" provision. In reversing the decree of the trial court dismissing the suit, the Supreme Court held the assignments void and of no effect so far as the employer was concerned and directed an injunction to issue. In the course of its opinion the court said:

"The only contract involved in this case to which appellant is a party, is its contract to pay its employees a certain compensation or wage for their services and under the law as it has been declared by our Courts, to pay the whole of said compensation or wage to either the employee or to any one assignee thereof, but there is no contract to pay except as a single act. In fact, appellant refused to enter into a contract with respondent Union as the bargaining agent for its em-

111

ployees which embodied the 'check-off' system; that is, the deduction from the pay of such employees as were members of respondent Union of the sum of $1 per month, and pay same over to the respondent Union. For a Court to enforce such partial assignment of wages would be tantamount to compelling appellant to enter into a contract, or writing a clause into a contract to which appellant objects. It is the duty of Courts to enforce contracts, but to refrain from making them. Stating the matter from another viewpoint, the enforcement of these partial assignments, and it is conceded by the parties to this action that the wage assignments involved are partial assignments, would be to force appellant to become the agent of such of its employees as are members of respondent Union and have executed a partial assignment of their wages to the Union, and also the agent of the respondent Union to collect from the one and to pay over to the other. The appellant has the legal right to refuse to accept such an agency even if it were offered compensation for the additional work thus devolved upon it. The appellant and the respondent Union, one a private corporation, the other an association of individuals, occupy no different position from that of any other class of citizens in the eyes of the law in South Carolina.

"While the Courts of this State recognize a partial assignment of a chose in action as an equitable assignment and will protect the assignee when they can do so without working a hardship upon the debtor, yet the enforcement of such partial assignment can only be had in a Court of Equity. See Carwile, Rec's, v. Metropolitan Life Insurance Company, 136 S. C. 179, 134 S. E. 285.

"At the present time there has been filed with appellant approximately 1,100 of these partial assignments. Basing the calculation on 1,100 assignments, it is the finding of the Master, concurred in by the Circuit

112

Judge, that it will require the services of or the additional work of one person an average of six hours per week to collect these dues.

"The record discloses that at the time of the taking of testimony in this case, the respondent Union had an additional 300 of these partial assignments, and that it intends also filing these with appellant. And, of course, as the membership of respondent Union increases (appellant has 2,300 employees) additional assignments will be filed with appellant. And, correspondingly the burden and hardship increases.

"Furthermore, if appellant can be compelled to recognize these partial assignments, either at law or in equity, then all other partial assignments which may be executed and delivered by appellant's employees would likewise have to be honored; and carried to a logical conclusion, appellant would have to do a banking business insofar as open checking accounts are concerned.

"It will therefore be seen that aside from the possibility of making errors in the collection of these dues, for which appellant would be answerable, and the possibility of having to defend actions for wrongfully deducting dues where there is a dispute as to whether an employee has actually executed an assignment, the appellant would suffer financial burden and hardship if it be compelled to recognize these partial assignments, and this we hold as a matter of law, would be a burden and hardship to which a court of equity cannot lend its aid."

While appellant in this action does not seek to recover directly from appellee the amount which it claims it is entitled to receive by virtue of the three cents per cwt. clause of its contract with its members, the principles announced in Pacific Mills v. Textile Workers' Union, supra, are applicable. In our opinion, upon this record, appellee should not be required or obligated to recognize this provision in appellant's

113

marketing agreement and, so far as appellee is concerned, this provision is unenforcible.

Whether appellee was under any obligation to pay appellant the entire amount due from it for milk delivered to appellee by appellant's members presents a different question. Appellee had been advised by appellant that its members were authorized to deliver milk to appellee. Appellee also knew the provisions of the marketing agreement which gave appellant "full power and authority in its own name, to collect the entire amount due for milk delivered" under its contract with its members. On June 29, 1953, appellee was furnished with copies of the contract executed by P.M.A. and its producing-members and a request from appellant to remit all money payable for milk received from its members direct to appellant. It refused to do so until it received a card from the producer directing appellee to "please issue payment for my milk to Pure Milk Association." From the members who requested appellee to remit to them a check covering payment for milk delivered by them, appellee refused to recognize the provisions of the membership agreement and remitted directly to the producer.

██ Under our statute relating to assignment of accounts receivable (Ill. Rev. Stat. 1953, chap. 121½, sec. 220 [Jones Ill. Stats. Ann. 109.312(1)]) sales of milk and the sums due the members of P.M.A. from appellee for milk delivered by them to it created accounts receivable and were subject to assignment. Section 221 [Jones Ill. Stats. Ann. 109.312(2)] of said chapter, being par. 2 of the same Act, provides: "Every assignment of an account receivable heretofore or hereafter made in writing for valuable consideration shall be valid and shall be deemed and held to have been fully perfected at the time such assignment was or is made, notwithstanding that the obligor be not notified of or does not assent to such assignment." Appellant, under its contract with its members, had a right to

114

collect from appellee for the milk delivered by its members to appellee. The language used in the membership agreement shows an intention on the part of the member, the creator of the account receivable or chose in action, to transfer it to appellant and that was sufficient to vest the same in appellant (4 Am. Jur., Assignments, Sec. 75, p. 287). Appellee recognized this, and upon the return to it of the card of a member directing it specifically to issue payment for the member's milk to appellant, it did so.

The gravamen, however, of appellant's complaint is appellee's letter of July 2, 1953, to its members and the postal card enclosed therewith. The breach of the membership agreement complained of occurred when appellee received from approximately one-half of appellant's members a request directing appellee to send to each of them the entire amount of his milk check. When the member did this, he did so in violation of the provisions of section 5 of his contract with appellant. That section gave appellant "full power and authority in its own name to collect the entire amount due for milk delivered" under the contract.

Counsel for appellee argue that even though a breach of contract between appellant and its members occurred, it cannot be held that appellee purposely caused such a breach as appellee did nothing to persuade any member of P.M.A. to breach his contract. Counsel for appellant insists that the letter of appellee of July 2, 1953, not only encouraged but invited appellant's members to breach their membership agreement with it and particularly direct our attention to that portion of this letter which said: "In order for us to comply with their wishes (i. e. to pay appellant for all milk delivered to appellee by members of P.M.A.), it will be necessary for us to know if you intend to pay your P.M.A. dues directly to the association, or if you want us to forward full payment for your milk to the Association." Counsel for appellant state that this is

115

a clear offer by appellee to assist the members of P.M.A. to breach their contracts by paying them the full proceeds of their milk and, to substantiate that conclusion, call to our attention the fact that after the card sent out on July 2, 1953, had been returned by one-half of appellant's members requesting appellee to send their milk check to appellant, appellee, on July 24, 1953, again wrote the several members of P.M.A. informing them that one-third of their Stockton patrons were members of P.M.A.; that appellee could not become a collection agency for any organization; that less than one-sixth of its patrons had instructed it to issue payment for their milk to P.M.A.; that they will issue one check only to P.M.A. for all milk delivered by its patrons; that P.M.A. would then issue separate checks to its members, and that all other parties would continue to receive their milk checks directly from appellee.

The facts are that approximately one-half of the members of appellant breached the provision of their contracts with appellant when in answer to appellee's inquiry they directed appellee to send their milk checks directly to them. Who, if not appellee, was responsible for this? Counsel for appellee assert that when appellee received from appellant a demand to remit to it all money payable for milk delivered to appellee by appellant's members that it then became the duty of appellee to inquire from each member his wishes and that appellee was entitled to be advised of the existence and scope of appellant's agency and that there is nothing contained in its letter of July 2, 1953, that can be said to indicate a desire upon the part of appellee that the members of P.M.A. select one of the two offered options in preference to the other for payment for their milk. The answer to this assertion is that appellee already had that information. It had had it since July 25, 1952, at which time plaintiff furnished defendant with the names of its producer-

116

members, their respective addresses, their milk-can and contract numbers, and the effective date of the contracts. If appellee had no intention of procuring any member of P.M.A. to breach the provisions of his contract with appellant, it would have complied with the authorization contained in the contract and sent its check to appellant, as the contract provided, and not communicated with the member. Appellee, in this letter of July 2, 1953, didn't inquire whether the patron had executed any contract with P.M.A. or whether the contract, which it knew about, had been terminated, amended, or whether it gave appellant the authority it claimed. It inquired whether the member wished to receive his milk check direct from appellee. It accomplished, in our opinion, just what it was intended to accomplish when in reply one-half of appellant's members directed appellee to send their milk checks direct to them, thereby breaching what appellee knew was a provision of the members' contract with appellant.

The author of the article on Interference in 30 Am. Jur., Sec. 19, pp. 71–72, says that the weight of authority supports the rule that an action will lie against a person who, otherwise than in the legitimate exercise of his own right, procures a breach of any contract, even though it is not a contract of employment. The author of this article then continues: "The theory of this doctrine is the right to perform a contract and to reap the profits resulting from such performance, and also the right to performance by the other party, are property rights which entitle each party to protection, and to seek compensation by action in tort for any injuries to such contract." In support of the text, Bloom v. Bohemians, 223 Ill. App. 269, and Doremus v. Hennessy, 176 Ill. 608, are cited. In the Bloom case the court sustained a judgment for damages based upon the action of the defendant in inducing an actor to leave the employment of the plaintiff and enter the

117

service of the defendant before his contract with the plaintiff had expired. In the Doremus case the court sustained a judgment for the plaintiff holding that the evidence disclosed that the defendants induced certain persons to terminate their contractual relations with the plaintiff. In both cases the court cited and quoted from Bowen v. Hall, 50 L. J. Q. B. 305, where it is said: "Merely to persuade a person to break his contract may not be wrongful in law or in fact. But, if the persuasion be used for the indirect purpose of injuring the plaintiff or of benefiting the defendant at the expense of the plaintiff, it is a malicious act, which is in law and in fact a wrong act, and therefore a wrongful act and therefore an actionable act if injury ensues from it."

■■ This contract, executed by appellant and its members, created a principal and agent relationship to which appellee was not a party. It became involved, however, when it received milk from a party to the contract. Appellee was advised of this relationship which existed between appellant and its members and knew the provisions of the contract which established the principal-agency relationship. Under the authorities, it owed appellant the duty not to persuade or solicit its members to breach their contract. Appellee violated that duty and is responsible to appellant for the damages occasioned thereby.

The decree of the Circuit Court is reversed, and this cause is remanded with directions to proceed in accordance with the views herein expressed.

Reversed and remanded.

EOVALDI and CROW, JJ., concur.

ADDITIONAL OPINION ON PETITION FOR REHEARING

In their petition for rehearing, counsel for appellee state that they are in accord with our statement that the gist of this case is whether defendant, in sending

118

its letter of July 2, 1953, to members of P.M.A. sought to induce those members to breach their contracts with the plaintiff. Counsel then state, and we agree, that defendant's conduct could not possibly be deemed wrongful prior to defendant's acquiring knowledge of the existence of the relationship which existed between plaintiff and its members. Therefore the remaining decisive question is the time defendant knew of the relationship which existed between the plaintiff and its producer-members. Defendant insists that it did not have this knowledge until it received the letter of plaintiff of February 24, 1954, and the accompanying parcel containing the original contracts of P.M.A. and its producer-members. From the pleadings and stipulated facts, the conclusion, however, is inescapable that defendant had this knowledge on and prior to July 2, 1953.

The amended complaint alleged that on or about July 25, 1952, the plaintiff informed defendant by letter of the effective date of its marketing agreement with R. M. Funston and thirty-eight other dairy farmers, giving to defendant the contract number and can number. The answer of the defendant states: "It (defendant) admits that it received a letter from plaintiff dated July 25, 1952, a copy of which is attached hereto as exhibit 1 and by this reference made a part hereof. . . . It admits that it has received other letters from plaintiff similar in form to said exhibit I. . . . It admits that all dairy farmers with respect to whom plaintiff has addressed correspondence to defendant similar in form to said exhibit 1, have, both prior and subsequent to such correspondence, delivered grade B milk to defendant at its said establishment at Stockton, Illinois, and that plaintiff by such correspondence has purported to inform defendant that such deliveries were made to defendant pursuant to the authorization and direction of plaintiff." The let-

119

ter of July 25, 1952, referred to in the pleadings, stipulation, and opinion, is as follows:

"Kraft Foods Company July 25, 1952
505 N. Sacramento Blvd. Delivery Point
Chicago 12, Illinois Stockton, Ill.
 Grade B

Gentleman: Attention C. W. Krefft
The following members of Pure Milk Association are authorized to deliver milk to you:

| Contract Number | Cans Number | Name and Address of Member | Effective Date |
|---|---|---|---|

(Please note attached list)

Thank you for your cooperation.

 Very truly yours,
 Pure Milk Association

Kraft Foods Company—Stockton Plant—Grade 'B'
505 N. Sacramento Blvd.,
Chicago 12, Illinois—All Producers Listed—Effective
 8–1–52

| Name and Address | Contract No. | Can No. |
|---|---|---|
| Elmer Carroll R#1, Elizabeth, Illinois | 42808 | #14 |
| Leland Pierce, Sr., and Leland Pierce, Jr. R#3, Stockton, Illinois | 42831 | #25 |

(Then follows the name, address, contract number
and can number of 37 other persons)"

Upon the hearing, it was stipulated that on or about the effective dates of a contract between plaintiff and its producer-member the plaintiff mailed to defendant and defendant received a letter similar to its letter of July 25, 1952. In its letter of June 29, 1953, set forth in the opinion, plaintiff furnished defendant with the names and addresses of its members and a copy of its contract with those members. If appellee had no

120

knowledge of the provisions of the contract of P.M.A. and its producer-members why did it refuse to deduct and remit to P.M.A. the 3¢ per cwt. checkoff to plaintiff as therein provided?

By its answer to the amended complaint, defendant admitted that plaintiff requested it to withhold this checkoff, admitted receiving a registered letter dated June 29, 1953, from P.M.A., requesting that this be done and made a copy of that letter a part of its answer. It is apparent that defendant had knowledge of the provisions of P.M.A.'s contracts with their producing-members prior to the time it wrote its letter of July 2, 1953.

The opinion is slightly modified, and, as modified, the petition for rehearing will be denied.

Rehearing denied.