ROY M. GETSCHOW, Plaintiff-Appellee, *v.* COMMONWEALTH EDISON COMPANY, Defendant-Appellant.

First District (1st Division)   No. 81—2578

Opinion filed December 20, 1982.

Laurence D. Lasky, F. Willis Caruso, and John W. Treece, all of Isham, Lincoln & Beale, of Chicago, for appellant.

Paul E. Plunkett, Stanley J. Parzen, and Mayer, Brown & Platt, all of Chicago, for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff brought this action against Commonwealth Edison Company (Edison) for tortious interference with contractual relations. After hearing several days of testimony, the trial court entered judgment for plaintiff in the amount of $295,000, representing both compensatory and exemplary damages. On appeal, defendant contests the court's findings with respect to liability, as well as the amount and nature of damages awarded.

The record discloses the following facts:

During the early 1970's, plaintiff entered into the business of representing building trades contractors to potential buyers of their services. Plaintiff sought sales positions with companies in different fields

of the building trades which would enable him to sell the products and services of each contractor separately, to present a single bid to an owner on behalf of several or all of his contractor-clients, and to arrange for two or more of his contractors to "co-venture" portions of a construction project. By January of 1976, plaintiff had entered into separate employment contracts with seven contractors, each in a different field. While the terms of these contractual arrangements varied, at the time of Edison's alleged interference plaintiff was receiving salary plus a percentage commission from five of the seven contractors and a straight commission from the remaining two. Plaintiff had become successful in selling the products and services of his employers to many owners and his sales and commissions had grown from a few thousand dollars in 1972 to more than $20,000 during the 12 months prior to Edison's claimed interference.

Edison was and is one of the largest customers of building contractors in Chicago due to its extensive construction and maintenance work. In his previous position as the president of an industrial pipefitting concern, plaintiff had worked closely with Edison over a seven-year period, during which time he developed business, personal and social ties with many of the Edison personnel, including its buyers and construction engineers, and Edison was among the many companies that plaintiff later called upon as a salesman for his principals. By the spring of 1976, plaintiff had been calling on Edison's buyers in this capacity for more than five years, had been successful in placing his contractors on Edison's approved bidders list and had earned commissions on many successful bids submitted to Edison.

The events leading up to plaintiff's cause of action against Edison began in March of 1976 with a meeting between plaintiff and Edward Jennett, Jr., sales manager for Johnson Controls, a potential contractor-client. The purpose of the meeting was to discuss a possible employment relationship, and at that time plaintiff apparently mentioned certain "contacts" he had with Edison. At the time of said meeting, Johnson Controls had a bid pending at Edison for work on a new project. It is undisputed that although there was mention of the pending bid, plaintiff did not then or at any other time suggest that he could or would do anything with regard to it.

Jennett reviewed plaintiff's request for employment with his superior at Johnson, Joseph Lewis. Despite Jennett's efforts to advise Lewis only of plaintiff's good faith intentions in seeking a sales position with Johnson, Lewis prepared a memorandum entitled "Mr. Getschow's Offer" relating to plaintiff's solicitation of Johnson's business. The memorandum stated:

"*** Mr. Getschow reports that he is an independent Contractor Representative who represents a number of contractors doing work with Commonwealth Edison. *** He reports that he knows the right people at Commonwealth and would be in a position to help us. *** Ned Jennett called me with this information and said that Mr. Getschow needed an answer. My response to Ned's call was that Mr. Getschow's request sounded like a payoff.

If, in fact it was a payoff, the answer was a plain and simple 'no.' My instructions to Ned were to soft peddle the answer to Getschow; merely put it on the back burner. Ned did just as instructed, however, Mr. Getschow persisted calling 3 or 4 times between March 30, 1976 and April 9, 1976. On Friday, April 9, Mr. Getschow said he needed an answer. *** On Monday, we were called by Commonwealth Edison and informed that the job was awarded to Powers [another contractor]."

Although Jennett was the only individual at Johnson Controls who ever actually talked with plaintiff, Jennett never saw or knew of the existence of the Lewis memorandum prior to the ensuing trial. The trial court ultimately found that the memorandum had "no validity in substance or fact."

Some time later, in May of 1976, the Lewis memorandum came into the possession of Thomas Ayers, Edison's chairman. Ayers referred the memo to Glenn Beeman, a vice president in purchasing, who, in turn, referred the matter to H. L. Holmberg "for investigation." Holmberg reported back the following day, after having spoken with the buyers in Edison's purchasing department and having found no indication that any payoffs had been made or that plaintiff had been instrumental in securing any Edison contracts for his clients. Holmberg also showed Beeman the "calling card" which plaintiff had distributed to Edison's purchasing department listing the seven contractors plaintiff represented, and a "Business Placed" memorandum showing when Edison had requested bids from plaintiff's clients and the dollar amount of business that Edison had done with each during 1974 and 1975. It is clear that no one at Edison ever checked with Jennett or anyone else at Johnson Controls to determine if the suggestion of a "payoff" in the Lewis memo had any factual basis, nor did Edison investigate the existence of any conflicts with respect to plaintiff's other contractors, although one of them was at that time a principal bidder on the same project as Johnson. There was no evidence adduced at trial that plaintiff had bribed or attempted to bribe any Edison employee; to the contrary, the evidence showed that Edi-

son had an elaborate system of controls for analyzing incoming bids which made "payoffs" almost impossible.

In spite of the fact that Holmberg's investigation revealed nothing to substantiate the allegations in the Lewis memorandum, Beeman proceeded to draft a letter intended for plaintiff's contractor-clients. Beeman's sending of an identical letter to each of plaintiff's seven contractors constituted the act of "interference" on which plaintiff's cause of action is based. The letter stated:

"As you know, your company and mine have a long standing business association.

It has recently come to my attention that Mr. Roy M. Getschow has indicated, as shown on the attached copy of his calling card, that he represents your company for purposes of our continuing business relationship. I am not aware of the nature of Mr. Getschow's status with respect to your company, but I wanted to assure you that business is available from Commonwealth Edison Company only on the basis of most favorable price and the best quality.

Further, I want to call to your attention a condition of Commonwealth Edison Company's EXHIBIT C, GENERAL CONDITIONS, which is included in all of our purchase contracts:

Covenant Against Brokerage. The Contractor warrants that no person or commercial agency has been engaged to solicit or secure the Contract, and agrees that the Contractor shall pay no compensation to any person or commercial agency for soliciting or securing the Contract, except in the case of bona fide employees or bona fide established commercial agencies maintained or utilized on a continuous basis by the Contractor for the purpose of securing business generally. For breach of violation of this warranty, the Owner shall have the right to annul the Contract without liability or in its discretion to deduct from the contract price or consideration, or otherwise recover, the full amount of any such compensation paid.

Sincerely,

Glen W. Beeman
Vice President."

Prior to sending the letter to plaintiff's contractors on May 25, 1976, Beeman called plaintiff in and showed him the draft. At that time plaintiff stated that he did not understand the letter, but that if it was sent he would be terminated by his contractors and his reputa-

tion would be damaged. Beeman's response was that he was not interested in plaintiff's business generally, but that he would no longer allow plaintiff to call on Edison. Beeman did not tell plaintiff about the "payoff" allegations in the Lewis memo, nor was plaintiff given any opportunity to explain his employment relationship with the seven other contractors. Beeman then mailed eight copies of the letter, one to each of plaintiff's present employers and one to Johnson Controls. At plaintiff's request, the parties met again some two weeks later, at which time plaintiff told Beeman that he had already been terminated by some of his contractors and asked if anything could be done to save his business, to which Beeman responded negatively. Within a few months all seven of plaintiff's employers had terminated their contracts with him.

The trial court found that the Edison letter was the cause of each of the terminations and that the Lewis memorandum was the actual and sole cause of Edison's action in mailing the letter. The court further found the language in the quoted "Covenant Against Brokerage" to be ambiguous and, as used by Edison for the first and only time against plaintiff, improper because it required that only a full-time employee working 12 months a year and representing a single principal could call on Edison on behalf of a contractor. The brokerage provisions had never been applied against any representative of a seller from the time of its insertion into Edison's contracts in 1971 until the time of trial, despite the fact that manufacturers' representatives representing more than one company had called on Edison continuously during that period. The court therefore found that the use of said covenant against plaintiff was a mere "pretense" on Edison's part to mask its true motivation for the letters—the Lewis memorandum.

Having found that Edison had intentionally and without justification interfered with each of plaintiff's seven employment contracts, the trial court awarded plaintiff $270,000 in compensatory damages, based on plaintiff's earnings prior to the interference and upon plaintiff's testimony concerning his expected future earnings under the contracts. The court also awarded $25,000 in punitive damages, based upon the means used by Edison to interfere with plaintiff's employers, Edison's concealment of the Lewis memorandum as the real basis for its action, its failure to investigate into the allegations contained in the memo, and its false pretense in using the Covenant Against Brokerage to justify the interference.

Edison asserts that the trial court erroneously reversed the burden of proving justification for the interference and applied an incorrect legal standard as to the existence of such justification, and also

argues that a finding of liability would be improper in any event since its conduct was justified as a matter of law. Neither the record before us nor the applicable law supports defendant's contentions.

■ In reaching its determination, the court relied on *Belden Corp. v. Internorth, Inc.* (1980), 90 Ill. App. 3d 547, 413 N.E.2d 98, setting forth the essential elements of the tort of interference with contractual relations. These include: (1) the existence of a valid and enforceable contract between plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by defendant's wrongful conduct; and (5) damages. 90 Ill. App. 3d 547, 551.

Edison does not dispute that plaintiff had seven valid and enforceable employment contracts at the time it sent the letters, nor does defendant deny its awareness of these contractual relations at that time. Edison contends, however, that the trial court erred in applying the standard applicable to interference with contractual relations as opposed to interference with prospective business advantage since Edison did not induce the "breach" of any contract, but rather, the contracts involved either lapsed or expired by their terms. Edison also submits that since the contracts involved were terminable at will or upon certain notice, plaintiff had no more than a "mere expectancy" of economic gain. Defendant cites that portion of *Belden Corp. v. Internorth, Inc.* where the court viewed the distinction as "a matter of expectancies" and stated that "as the degree of enforceability of a business relationship decreases, the extent of permissible interference by an outsider increases." 90 Ill. App. 3d 547, 552.

We believe that the trial court correctly applied the standard applicable to interference with contractual relations. We also note, however, that defendant's conduct does not fall within the type of "permissible interference" by a *bona fide* competitor referred to by the court in *Belden*, and defendant has therefore failed to show how the court's ruling would have been different under any standard. See *Belden Corp. v. Internorth, Inc.* (1980), 90 Ill. App. 3d 547, 552.

■ Illinois courts have long held that maliciously causing a breach of contract terminable at will is actionable (*London Guarantee & Accident Co. v. Horn* (1903), 206 Ill. 493, 69 N.E. 526) and governed by the standards for interference with contractual relations. (*W. P. Iverson & Co. v. Dunham Manufacturing Co.* (1958), 18 Ill. App. 2d 404, 152 N.E.2d 615; *B. R. Paulsen & Co. v. Lee* (1968), 95 Ill. App. 2d 146, 237 N.E.2d 793; accord, *Ancraft Products Co. v. Universal Oil Products Co.* (1980), 84 Ill. App. 3d 836, 405 N.E.2d 1162.) These

cases make clear that the termination of a contract, as opposed to a "breach," is enough to provide a cause of action. As stated in *Iverson*, the gist of the action is the malicious interference in the contractual relation between plaintiff and another—that the defendant's interference caused the third party to do an act which it otherwise would not have done. This is so even though the third party may have had the right so to act had the malicious interference not been exercised. (18 Ill. App. 2d 404, 417; accord, *Bergfeld v. Stork* (1972), 7 Ill. App. 3d 486, 288 N.E.2d 15.) It is also well settled that "malice," when used in this context, does not require a showing of ill will, hostility or an intent to injure; plaintiff need only show that the defendant acted intentionally and without just cause. *Amalgamated Financial Corp. v. Atlantis, Inc.* (1982), 105 Ill. App. 3d 379, 381, 434 N.E.2d 417, citing *W. P. Iverson & Co. v. Dunham Manufacturing Co.* (1958), 18 Ill. App. 2d 404.

In dealing with substantially similar conduct by a defendant which caused the modification of an existing contract between plaintiff and another, the Seventh Circuit in *Hannigan v. Sears, Roebuck & Co.* (7th Cir. 1969), 410 F.2d 285, *cert. denied* (1969), 396 U.S. 902, 24 L. Ed. 2d 178, 90 S. Ct. 214, held that the defendant could reasonably have been found to have induced a "breach of contract within the true meaning of the tort" by coercively interfering in the relationship between plaintiff and the third party. There, the court stated:

> "To us, there is no legally significant distinction between unabashed third party conduct which induces one party to outrightly repudiate and breach its contract with another and subtle third party conduct which achieves essentially the same result \*\*\*.

> To distinguish between conduct which directly causes a breach of contract and unjustifiable coercive conduct which effects the same result *without a breach* would overly limit the significance of the tort of inducing breach of contract and invite today's superior economic forces to freely interfere with contractual relationships without fear of legal reprisal." (410 F.2d 285, 291.)

Accord, *Venturini v. Affatato* (1980), 84 Ill. App. 3d 547, 405 N.E.2d 1093.

■ Plaintiff here was a party to seven valid employment contracts at the time of Edison's interference. Many of these had been in existence for several years and all had been continuously renewed since their inception. Plaintiff also produced testimony at trial of his overall satisfactory relationship with each of the contractors. Based

on these facts, plaintiff had a certain and enforceable expectation of receiving the benefits of these contracts for an indefinite period. The only issue with respect to liability, therefore, is whether Edison's conduct was intentional and without just cause.

The trial court in its written opinion cited *Swager v. Couri* (1979), 77 Ill. 2d 173, 395 N.E.2d 921, in which the supreme court held that lack of justification is an element of plaintiff's case which must be pleaded and proved. (77 Ill. 2d 173, 179.) We agree with the trial court that plaintiff sustained his burden.

■ Whether there is just cause for interference depends upon a number of factors, including the interest sought to be protected and the methods used. (See *Herman v. Prudence Mutual Casualty Co.* (1969), 41 Ill. 2d 468, 244 N.E.2d 809; *Supreme Savings & Loan Association v. Lewis* (1970), 130 Ill. App. 2d 16, 264 N.E.2d 857; *Connaughton v. Gertz* (1981), 94 Ill. App. 3d 265, 418 N.E.2d 858.) As stated in *Connaughton*, the third party claiming the privilege must be acting to protect a conflicting interest that is considered to be of equal value to or greater than plaintiff's contractual rights, and the third party's acts to bring about the breach must be legal acts and not unreasonable in the circumstances. 94 Ill. App. 3d 265, 270.

Edison contends that its interest in sending the letters was to protect its policy of not dealing through brokers. The trial court rejected this purported justification, however, based in part on the testimony of defendant's own employees that they did not consider plaintiff to be a broker, as well as Edison's course of conduct with respect to plaintiff for several years prior to the interference. The trial court also found that Edison's actions were unreasonable under the circumstances. These determinations are amply supported by the record.

■ Contrary to defendant's assertions, this case involves more than Edison's refusal to deal with plaintiff. Such a right, if it existed, could have been protected by Beeman's instructions to Edison's employees not to deal with plaintiff. Nor did Edison's letters merely transmit "truthful information." Rather, the trial court found that Edison, by its letters, effected "economic duress" on plaintiff's employers causing each of them to terminate their contract with plaintiff. This fact was attested to by several of the contractors at trial. In addition, the record contains letters written to Edison expressing the contractors' intentions to comply with its "Covenant Against Brokerage" and apologizing for even the appearance of impropriety in that regard. This was even true of one contractor which plaintiff had never represented at Edison pursuant to his employment arrangement. Based on the foregoing, the trial court correctly found defend-

ant liable for interference with plaintiff's contractual relations. See *Hannigan v. Sears, Roebuck & Co.* (7th Cir. 1969), 410 F.2d 285, and *Pure Milk Association v. Kraft Foods Co.* (1955), 8 Ill. App. 2d 102, 130 N.E.2d 765.

Turning to the issue of damages, Edison argues that the trial court's award was based on speculation and was not supported by the evidence. Edison also argues that exemplary damages are improper in this case.

Edison first contends that the trial court erred in accepting plaintiff's projections which were based on a six-month period immediately preceding the interference when plaintiff's earnings from both salary and commissions were at an all-time high, that the court considered gross, rather than net, profits as the basis for its calculations and improperly projected these figures for a 4½ year period to determine lost profits. Edison also challenges the inclusion of retainers and projected commissions from Edison projects in plaintiff's calculations of lost profits as being inconsistent with its purported right not to deal with plaintiff. Lastly, Edison points to alleged inconsistencies in plaintiff's testimony and proffered exhibits which, it contends, induced the trial court to premise an award based on wholly erroneous figures.

■ ■ After hearing the evidence, the court awarded $270,000 in compensatory damages. While its precise method for arriving at this figure is not clear from the record, the court had before it plaintiff's income and expense records for the 4½ years prior to Edison's interference, Federal records indicating growth in the construction industry during that period and the period subsequent to the interference, and plaintiff's testimony as to expected future profits which was based on both his lengthy experience in the industry and his sales efforts shortly before the interference. The court's language also indicates that it took account of inflationary factors from the time of the interference to the time of judgment. (See *Raines v. New York Central R.R. Co.* (1970), 129 Ill. App. 2d 294, 302, 263 N.E.2d 895, *rev'd on other grounds* (1972), 51 Ill. 2d 428, *cert. denied* (1972), 409 U.S. 983, 34 L. Ed. 2d 247, 93 S. Ct. 322, and *Republic Gear Co. v. Borg-Warner Corp.* (7th Cir. 1969), 406 F.2d 57, 62, *cert. denied* (1969), 394 U.S. 1000, 22 L. Ed. 2d 777, 89 S. Ct. 1591.) In determinations such as the one before us, our courts have consistently recognized certain limiting factors: first, since the loss of profits is not a matter ordinarily susceptible to highly detailed direct proof, inferential proof must be admitted to establish the amount of damages; and second, the assessment of damages by a trial court sitting without a jury will not be set aside unless manifestly erroneous. (*Monotronics Corp. v. Baylor*

(1982), 107 Ill. App. 3d 14, 17, 436 N.E.2d 1062; *Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, 321 N.E.2d 1, *cert. denied* (1975), 420 U.S. 975, 43 L. Ed. 2d 655, 95 S. Ct. 1398; *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 281 N.E.2d 323.) These factors take on particular relevance where, as here, the trial court's task was to compute a damage award based on evidence of a constantly growing and developing enterprise. Our review of that determination is further limited in the instant case by the summary nature of plaintiff's exhibits and the fact that neither these exhibits nor plaintiff's testimony with regard to lost earnings was challenged at trial. We have carefully reviewed the record and will examine each of Edison's contentions in light of the above observations.

The trial court had before it records reflecting the gradual growth of plaintiff's business from its formation in 1971 to the time of Edison's interference in 1976, when plaintiff was involved in ongoing employment relationships with seven different contractors. It is undisputed that plaintiff's income from both salary and commissions nearly doubled during the period from mid-1975 to May of 1976 as a result of his securing the last three of his seven contracts during that time. At trial, plaintiff also testified as to his conversations shortly before Edison's interference with several owners in the area who later carried out substantial construction work. Based on these contacts, upon which he could reasonably have anticipated new work, proven past performance and Federal records evidencing the dramatic increase in nonresidential construction in the years 1977 through 1980, plaintiff testified that his anticipated earnings for the second half of 1976 would equal his actual earnings of approximately $25,000 in the first half of that year, and then projected a 10% increase in earnings for the succeeding three years.

Edison now contends that plaintiff's projections constituted pure speculation when based on a single six-month period. Edison also points to plaintiff's omission of business expenses for the first half of 1976 in his summary exhibit which, it contends, when combined with plaintiff's testimony resulted in fatal miscalculations by the trial court. Edison's present challenge merely assumes, however, that the court accepted plaintiff's testimony and projections in a vacuum, a conclusion for which we find no support in the record.

As previously noted, the court had an opportunity to view the complete history of plaintiff's business activity beginning in 1972 and steadily progressing to an all-time high in 1976, when it was virtually halted as a result of defendant's conduct. Under the circumstances, we believe that the trial court could properly take account of the sub-

stantial increase in activity over the 12 months preceding Edison's interference in formulating a reasonable basis upon which to project lost profits and that such would not indicate a disregard of plaintiff's actual experience, as defendant contends.

We similarly find no support for defendant's contention that plaintiff's failure to account for business expenses for a six-month period resulted in a damage award based on gross earnings which failed to recognize any future expenses. While it is true that the assessed damages for lost profits are to be based on net profits or a reasonable approximation thereof and not on gross profits (*Henry's Drive-In, Inc. v. Anderson* (1962), 37 Ill. App. 2d 113, 125-27, 185 N.E.2d 103; *Eastman Kodak Co. v. Southern Photo Materials Co.* (1927), 273 U.S. 359, 71 L. Ed. 684, 47 S. Ct. 400), the trial court clearly had before it sufficient information upon which to base such an approximation. Net profits constitute the difference between gross profits and the expense of operating the business. (*Eastman Kodak Co. v. Southern Photo Materials Co.* (1927), 273 U.S. 359, 71 L. Ed. 684, 47 S. Ct. 400.) Plaintiff's records, which were available to the trial court, show that his expenses remained low and relatively constant from 1972 through 1975, despite the fact that his earnings more than doubled during that period. The court could take notice of the fact that the nature of plaintiff's work as a salesman for building trades contractors enabled him to maintain low overhead costs which were not significantly affected by large fluctuations in his gross earnings. Where such expenses are nominal or fixed, a plaintiff's failure to introduce evidence of these expenses will not automatically render the resulting damage award invalid. (*Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 148; *Hannigan v. Sears, Roebuck & Co.* (7th Cir. 1969), 410 F.2d 285, 293.) All that is required is that the court use a reasonable basis for computation and such a reasonable basis shall be sufficient to establish damages even though the result is only approximate. Further, a defendant whose wrongful conduct caused the difficulty in ascertaining the precise extent of plaintiff's actual damages will not be heard to complain of the resulting uncertainty. *Henry's Drive-In, Inc. v. Anderson* (1962), 37 Ill. App. 2d 113, 126; *Eastman Kodak Co. v. Southern Photo Materials Co.* (1927), 273 U.S. 359, 71 L. Ed. 684, 47 S. Ct. 400.

We have reviewed the record with regard to defendant's remaining contentions and cannot say that the trial court failed to use a reasonable basis for its compuations or that its award was manifestly erroneous. The nature of plaintiff's employment as a salesman and the fact that his business was obtained through the competitive bid-

ding of his employers required the court to accept largely inferential proof on the question of lost profits. There is no question but that Edison's conduct caused the almost immediate termination of each of plaintiff's contracts and defendant has failed to put forward any evidence, other than that proffered by plaintiff, which would prove with precision the amount that plaintiff would have earned but for defendant's wrongful conduct. Since we have found that the trial court's basis for projecting lost profits did not lack the requisite certainty, we also hold that the court's projection of plaintiff's lost profits for 4½ years into the future was not improper. See *Henry's Drive-In, Inc. v. Anderson* (1962), 37 Ill. App. 2d 113, 127.

Defendant lastly challenges the court's assessment of exemplary damages. We believe that under the facts and circumstances of this case such damages were properly assessed and awarded. It is clear that punitive damages are within the discretion of the trial court when, as here, the wrongful act complained of is characterized by wantonness, malice, oppression or circumstances of aggravation. (*Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 937, 419 N.E.2d 578.) The purpose of such damages is to deter the wrongdoer and others from repeating the wrongful conduct. (*Eshelman v. Rawalt* (1921), 298 Ill. 192, 197, 131 N.E. 675.) The trial court specifically found aggravating circumstances surrounding Edison's conduct, which findings are supported in the record. We find that defendant's intentionally coercive and oppressive conduct warranted the court's assessment of punitive damages in the instant case.

Although not pertinent to the merits of this appeal, we feel compelled to call the attention of the appellate bar to the provision of the supreme court rule covering the contents of briefs (87 Ill. 2d R. 341(a)), which states:

"Footnotes, if any, shall be used sparingly."

In this case appellant's brief contains 39 footnotes, appellee's, 41, and appellant's reply brief, 20. Under no circumstances can this use of 100 footnotes be described as "sparingly."

Judgment affirmed.

CAMPBELL, P.J., and GOLDBERG, J., concur.