(No. 84-CC-2803—)

HAROLD FRYMAN *et al.*, Claimants, *v.* THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, Respondent.

*Order on motion to dismiss filed January 31, 1985.*

*Order on petition for rehearing filed August 7, 1985.*

*Order on petition for rehearing filed January 13, 1986.*

*Opinion filed October 10, 1989.*

BRAZITIS & BURKE (PATRICK M. BURKE, of counsel), for Claimant.

GOSNELL, BENECKI, BORDEN & ENLOE, LTD. (JOHN BORDEN, of counsel), for Respondent.

## ORDER ON MOTION TO DISMISS

Raucci, J.

This cause coming on to be heard on the Respondent's motion to dismiss and the Claimant's objection thereto, the Court having considered the written arguments of counsel and the statutory provision involved, and being fully advised in the premises finds:

1. The complaint alleges that the cause of action accrued on July 18, 1982.

2. The complaint was filed on April 19, 1984.

3. The cause of action is one for slander and slander *per se.*

4. Section 13—201 of the Code of Civil Procedure provides that slander actions shall be commenced within one year next after the cause of action accrued. Section 13—211 provides that in the case of a minor, however, the action may be brought within two years after the disability has been removed. Ill. Rev. Stat. 1983, ch. 110, pars. 13—201, 13—211.

5. Section 22 of the Court of Claims Act provides in pertinent part:

"Every claim cognizable by the Court *and not sooner barred* by law shall be forever barred from prosecution therein unless it is filed with the Clerk of the Court within the time set forth as follows:

❋ ❋ ❋

(g) All other claims must be filed within two (2) years after it first accrues saving to minors, and persons under legal disability at the time the claim accrues, in which case the claim must be filed within two (2) years from the time the disability ceases." (Emphasis supplied.) Ill. Rev. Stat. 1983, ch. 37, par. 439.22.

6. All of the Claimants except Harold Fryman are (or were at time of the commencement of the action) minors.

7. Harold Fryman is barred from bringing this action in this Court.

8. This is a "personal action" but not an action for personal *injuries*. Therefore, notice was not required to be filed pursuant to section 22—1 of the Court of Claims Act.

9. The complaint is sufficient to withstand the motion to dismiss.

It is ordered that as to Harold Fryman the complaint is dismissed, with prejudice, and he is forever barred from maintaining this action in this court.

It is further ordered, that in all other respects, the motion to dismiss be, and it is hereby, denied.

## ORDER ON PETITION FOR REHEARING

RAUCCI, J.

This cause comes on to be heard on Claimant Harold Fryman's petition for rehearing. On January 31, 1985, this Court entered an order dismissing the complaint as to Claimant Harold Fryman. The order was based on the statute of limitations for maintaining a slander action.

The Complaint has two counts. Count I alleges that Claimant was accused "of stealing money from the children members of the Buckaneers 4-H Club." Count I further alleges a conspiracy to maliciously interfere with property rights and business relationships. Count II directly alleges slander. This Court's order dismissed both counts as to Harold Fryman.

Count I purports to state a different cause of action. Whether that action is susceptible to dismissal on other grounds, or whether it can be proven, is not before us at the current time.

It is ordered that the order of January 31, 1985, is modified to dismiss only count II as to Claimant Harold Fryman.

## ORDER ON PETITION FOR REHEARING

RAUCCI, J.

This cause coming on to be heard on Respondent's request for rehearing on the order of August 7, 1985, and the response thereto, the Court being fully advised in the

premises, it is hereby ordered that the petition for rehearing is denied.

## OPINION

RAUCCI, J.

The Claimants filed their complaint in tort on April 19, 1984. The history of the case indicates that only Count I survived the Respondent's motion to dismiss. Count I of the complaint seeks damages for Harold Fryman of $20,000, and for Micah Fryman, Jeanine Knakmuhs, Mike Knakmuhs, Anna Koughn, Christina Koughn, Lori Myers and Kathy Fryman, damages are sought in the amount of $2,000 each.

The complaint alleges that the Buccaneers 4-H Club was wrongfully disallowed from showing their cattle projects at the 1982 Edwards County fair by the Edwards County 4-H Council which is an extension council of the board of trustees of the University of Illinois. Claimant, Harold Fryman, seeks his damages for malicious interference with the rights of the Claimant, malicious interference with his business and expectancy of future business relationships, loss of potential income from sale of the cattle at the 1982 Edwards County fair, and at subsequent fairs and other business relationships. The remaining Claimants seek damages for the loss of potential income from the sale of their cattle at the county fair.

The cause was tried before the Commissioner over three days and produced three volumes of transcript. The evidence consists of the three-volume transcript, Claimants' Exhibits 1 through 10, 12A, 12B, 13 through 23, and Respondent's Exhibits 2 through 8. Both parties filed briefs and the Court heard oral argument. A motion

for judgment in favor of the Respondent made at the close of the Claimants' case was taken under advisement to be heard with the case.

## The Facts

Claimant, Harold Fryman, was the leader of the Buccaneers 4-H Club in July of 1982. The other Claimants were minors and all were members of the Buccaneers 4-H Club in July of 1982. The State of Illinois, through the board of trustees of the University of Illinois, is the Respondent in this cause because the Edwards County 4-H Council is an extension council of the University of Illinois. The 4-H program is established by the County Cooperative Extension Law. (Ill. Rev. Stat., ch. 5, par. 241 *et seq.*) Just prior to the 1982 Edwards County fair, the 4-H extension council received information that there were problems with the Buccaneers Club beef project.

Each club picks a project for a hands-on learning experience. The Buccaneers Club had chosen a beef project for 1982. The culmination of the project is to show the cattle at the county fair. The cattle, or at least some of them, are then put up for sale at the fair and various merchants and other persons in the community may bid for the cattle and often do at inflated prices.

Upon receiving allegations against the Buccaneers Club, the 4-H council proceeded to conduct a combination investigation and hearing prior to the fair. Some of the investigation was appropriate and some took on tones of a witch hunt. Actual rules were followed in some parts of the hearings and nonexistent rules were followed in other parts. Harold Fryman cooperated in some respects and was profane and uncooperative in other respects of the investigation. The end result was

that the Buccaneer Club was not allowed to show their cattle at the county fair. The Club's cattle were sold to the local stockyard for fair market value. No evidence was ever presented indicating that any merchant would have bid a specific price over fair market value for these cattle or for any of them. Harold Fryman presented no evidence as to any loss he personally suffered either in 1982 or in future years up to the time of trial.

The foregoing is a synopsis of the evidence. The following is a more detailed description of the evidence.

At the time of the occurrences alleged in Claimants' complaint, Edwards County, Illinois, had an active 4-H extension council. Respondent's Exhibit 4, *Guide to County Extension Council*, published by the University of Illinois, explains the procedure for appointment of the council members, who serve in a voluntary capacity without compensation. The guide states, "An important function of the councils is to cooperate with extension personnel in planning an educational program in agriculture, home economics, 4-H and youth community resource development, and subjects relating thereto." Respondent's Exhibit 7 is a booklet from the University of Illinois regarding the 4-H program and giving guidance on projects and activities. The importance of Respondent's Exhibit 7 is that it shows the purpose of 4-H is to maximize educational experience and make it enjoyable for the children. Exhibit 7 states that members are expected to select at least one project and complete one or more learning goals related to the project during the year. The project leaders help the 4-H members select materials or animals and teach them the knowledge and skills needed to conduct the project. In the section on activities, the booklet states, "4-H activities are another way of learning and are comparable to extra

curricular school activities." Respondent's Exhibit 6, from the beef manual, states the objectives of having a beef project. These include acquiring skills in and understanding the management of beef animals, gaining knowledge of wholesale and retail cuts of beef and beef products, learning how to relate to the live animal, and exploring job opportunites in the beef cattle industry. Members are expected to learn how to feed and care for the animal, what feeds are necessary, how to handle, fit, and show the animal, and how to keep accurate records.

4-H leaders are uncompensated and members of the 4-H council are not paid. Calvin Cowsert, regional director of the extension program, testified the purpose of 4-H is to help children from ages eight to 18 develop life skills. 4-H activities include workshops, tractor school, gun safety school, computer schools, pest management schools, public speaking contests, demonstration contests, and projects that cover the gamut from sewing and clothing, foods, computer projects, crops, and various kinds of animals, including pets. Martha Speir, Edwards County extension advisor, testified that the purpose is to learn by doing, and making money is not the purpose at all. Children are to develop skills and increase knowledge in different subjects. They are to keep records on each project. These records are very important and the purpose of 4-H is not to teach business or make a profit.

The children Claimants were preparing for the entry of their beef projects in the 1982 Edwards County fair. The Claimants had their steers prepared to show in the competition at the fair for awards and sale at the conclusion of the fair at the fair auction. The Edwards County fair was scheduled to begin on Monday, July 19, 1982. Concerns about the Buccaneers' steer projects

began on the Saturday evening prior to the fair. Jim Witte, a member of the fair beef committee, and Donald Fryman, a member of the 4-H council, advised Eugene Kelsey, the chairman of the 4-H council, that a parent by the name of Earl Loudermilk had told them that a member of the Buccaneers 4-H Club, Sherry Lomas, didn't know what she had paid for her steer, didn't know the division of the proceeds of sale, and that the steer was not kept at her house. Three Buccaneers families were investigated on the Saturday evening and Sunday morning. These three men who did all of the investigating did not investigate the families of the two leaders. The families who were investigated were the Lomas family, the Koughn family, and Doris Jackson, the mother of Kathy Fryman. Mrs. Linda Koughn testified that these three men came to her home to inquire as to her daughters' steer projects. She did not think it was any of their business and did not give them specific information. She did know what the arrangements were for the steers and had known so since the club's Christmas meeting. She did not give these individuals any indication that she did not know what the price was. She did not give them any indication that she was in any way not satisfied. She did not give them any indication that records were not kept and the men did not ask anything about records. Even though the three investigators were from the beef council and the 4-H extension council, Mrs. Koughn testified that she did not give them much information in response to their questions. Mrs. Koughn admitted that the steers claimed by her daughters as projects were kept at the Harold Fryman farm on an automatic feeding system. She indicated that she did not tell them what the price was for the animals, but admitted that she may have told them that the price depended on what the animals brought at sale. At the

trial she testified that the arrangement with Harold Fryman was that each child was to pay $500 for the animal and $50 for the eight months of feed payable after the sale, but she was very vague about the matter with the three investigators. Mr. David Koughn testified that the three men came to his house on Saturday, July 17, 1982, at approximately 9:30 or 10:00 p.m. He did not know why these men were at his house or what business it was of theirs. Mr. Koughn knew what the cost for the steer and feed would be. He did not give these men any indication that he did not know. Eugene Kelsey, chairman of the 4-H extension council, testified that Mr. and Mrs. Koughn were vague and that they said they did not know the price for the animal when the three investigated their daughters' projects. Mrs. Koughn admitted that she may have told them that the price depended on what the animals brought at sale. The Koughns indicated the price for the steer was undetermined, but they essentially stopped talking and did not disclose information to those trying to assemble information for the 4-H extension council to use to determine whether or not the projects were within the rules.

John Knakmuhs was one of the parents and helped lead the Buccaneers' 4-H Club with Claimant, Harold Fryman. He testified that the 4-H guidebook stated that a project suitable to the child should be selected, considering the child's age, situation, and skill. He admitted keeping records is an important part of the 4-H project and whether or not the child keeps records has a substantial bearing on whether or not the project is legitimate. The leaders had a responsibility to weed out illegitimate projects, according to the admission of John Knakmuhs.

There are guides from the University for the youngsters in the subjects they are working on. The child's records show his progress and evidence his involvement. The purpose of the 4-H projects is to motivate the child to become more deeply involved in areas of interest and this would lead him into leadership skills, cultural experiences, citizenship experience, and public affairs involvement.

Mrs. Doris Jackson was contacted on Sunday morning by Eugene Kelsey. She told Mr. Kelsey she did not know for sure what the price would be. She told him this because she didn't think it was any of his business. At that time, she did know what the price was. She did not give Mr. Kelsey any indication that her daughter's records on her steer project were not up to date. Eugene Kelsey testified that when he visited Doris Jackson she told him that her daughter's steer was kept at the Harold Fryman farm, and that she did not know what the price would be for the animal, but she thought that Kathy and Mr. Harold Fryman would "split the profit" from the animal. Eugene Kelsey also testified that Mrs. Jackson said the price and arrangements for paying for the feed were undetermined.

At the trial, Doris Jackson testified that the price for the steer was $500 and the price for feeding the animal from December until fair time was $50, payable after the auction. She readily admitted that she had told Eugene Kelsey, chairman of the 4-H council, the day before the fair opened that the price for the steer and charges for feed were unknown. She also admitted that she may have told Eugene Kelsey that the profit from the animal would be split with Harold Fryman.

Kathy Fryman's steer could not have been shown at the fair in any event, since it developed a bad case of

pinkeye, a contagious cattle disease, approximately two weeks before the fair. Doris Jackson admitted that the steer could not have been shown at the fair and Harold Fryman confirmed that pinkeye was a highly contagious cattle disease and he would not have let Kathy bring the steer to the fair no matter what the ruling had been by the 4-H council. This fact effectively defeats any possible claim by Claimant Kathy Fryman.

In furtherance of their investigation, the three-member investigation team of Eugene Kelsey, Don Fryman, and Jim Witte visited the Sherri Lomas residence on the day they received the report, the Saturday evening before the fair. They talked to Mrs. Lomas, since Sherri, a member of the Buccaneers Club, was not at home. Mrs. Lomas testified at trial that when the three investigators came to her home on the Saturday before the fair, they introduced themselves and explained their status or job title with regard to the 4-H business. Mrs. Lomas said she told them that as far as she knew, her child would receive the prize money only and she did not think her daughter would receive any of the auction proceeds. She told the three council members that the price of the steer, the cost of feed, and other arrangements were unknown.

These allegations of impropriety in the beef project all began with the Lomas family. Mrs. Pat Lomas, the mother of Sherri Lomas, the Buccaneers Club member, testified that her daughter Sherri was 16 years old at the time of her project in 1982. Mrs. Lomas did not attend any of the Buccaneers Club meetings and Mrs. Lomas did not participate with her daughter in the project. Neither Mrs. Lomas nor her husband ever went to Harold Fryman's property to check on the animal with their daughter and neither Mrs. Lomas nor her husband

ever went to any Buccaneers Club meetings. The parents didn't have anything to do with their daughter's steer project because they thought she had dropped it. Mrs. Lomas was aware that her daughter would attend monthly club meetings with the Buccaneers. She and her husband were opposed to her daughter having a steer project, but their daughter never told them that she was not keeping the project, and Mrs. Lomas never contacted Harold Fryman to tell him that she did not want her daughter to have a steer project.

Mrs. Lomas testified that her daughter Sherri told her that Harold Fryman suggested the children have a steer project. The parents never signed the required consent form for Sherri to have a steer project. They had paid nothing for the steer, and knew nothing about what Harold Fryman was expecting as payment for the steer, feed, rent, or care for the animal. They understood that their daughter was not sufficiently involved in taking care of the animal for it to be an appropriate project. Mrs. Lomas said she told Sherri that she could not have a project when she did not have records on it, but Sherri had said that Harold Fryman told her not to worry about the absence of records.

Mrs. Lomas testified that when Eugene Kelsey called Sherri subsequently, Sherri confirmed that she did not have any records, did not know what the price for the feed was nor the price for the steer, and had no agreement with Harold Fryman concerning the animal.

4-H club member, Micah Fryman, son of Claimant, Harold Fryman, testified that the five steers listed as projects by various club members were all kept together at his home farm. Micah Fryman testified that he took care of not only his own steer, but the steer projects of the other children, and the animals were kept on a self-

feeder four or five months from December until April when some of the other children started coming out to his family farm and helping him take care of them. These included steer projects attributed to Sherri Lomas, the two Koughn children, and Kathy Fryman.

There was a fourth club member, Lori Myers, who had a steer at the Harold Fryman residence. James Myers, Lori's father, testified that the steer had been kept at his own farm until shortly before the fair, but because it was wild they took it down to Harold Fryman's farm for him to work with to see if he could tame it down. He testified that the price for the animal was $500, due after the auction. Eugene Kelsey testified he telephoned James Myers on the Saturday or Sunday before the fair and Myers told Kelsey on the telephone that the price of the steer purchased from Harold Fryman was undetermined.

Claimant Harold Fryman was the Buccaneers Club adult leader. He testified that no council member contacted him on Saturday, July 17, 1982, or on Sunday, July 18, 1982, until he was summoned to attend a council meeting on that Sunday night. On the Saturday and Sunday before the fair, he saw various council members at the fairgrounds but no one mentioned anything to him about any investigation.

On the Sunday morning before the 1982 fair, Harold Fryman went to the residence of Martha Speir, home extension advisor. He explained that Lori Myers' 1000-pound steer was too wild for the eight-year-old child to walk through the show ring and asked if the animal could be judged tied up in its stall. Mrs. Speir told him that the rules required that the animal be led in the show ring in order to show and to qualify to be sold at the 4-H auction. Mrs. Speir further testified that she also

asked about the records of the Buccaneers 4-H Club and Harold Fryman admitted that his club members' records were not up to date.

Harold Fryman testified at trial that he told James Myers it was too risky to bring the wild steer of Lori Myers to the fair. Harold Fryman testified that Lori's steer would not have been brought to the fair because it was too wild. This fact effectively defeats any possible claim by Claimant Lori Myers. Since neither the Fryman steer nor the Myers steer could be shown in any event, they suffered no injury even if such injury constituted a compensable claim.

The decision of the 4-H council not to allow the Buccaneers Club's steers to be shown at the 1982 fair was based on the aforesaid investigation and a subsequent hearing on the Sunday night before the fair. A meeting of the 4-H council was called by Eugene Kelsey for Sunday evening, July 18, 1982. Members of the council were contacted shortly before the meeting and notified that there was some question about some projects and the 4-H council meeting was called to consider those projects. Members of the council testified that they did not have any dislike for Harold Fryman or want to cause him or any members of his club any difficulties, and some members of the council did not even know Harold Fryman. The purpose of the hearing was to try to clear up questions about projects because the information provided cast a bad reflection on the 4-H program.

The meeting was held Sunday evening, July 18, 1982, at about 6:00 p.m. Several members of the 4-H extension council, together with Martha Speir, home extension advisor, and Ross Helmy, agricultural extension advisor, met. Also present were two members of the beef committee and two visitors from the junior

148

fair board. As reported in the minutes of the meeting, there were four situations discussed, being the Sherri Lomas steer project, the two Koughn girls' projects, Kathy Fryman's steer project, and the wild steer of Lori Myers. It was determined that the rules required the animal to be led in the show ring and accordingly, the fourth project, Lori Myers' wild steer, was not permitted to be judged by tying it in the pen. Eugene Kelsey reported on the information assembled from the mother of Sherri Lomas, Mr. and Mrs. David Koughn, the parents of Anna and Christina Koughn, and Doris Jackson, the mother of Kathy Fryman.

Many of the factors negatively considered by the council concerning the steer projects of the Buccaneers Club were permissible under the rules in 1982. After the fair, the 4-H council decided to change some of their rules so that these matters in the future would not be permissible. Eugene Kelsey testified that the first complaint related to the steer of Sherri Lomas. Complaint was raised that the steer was at the leader's house instead of at the Lomas house, although this was permitted in 1982. Another complaint was that she had not paid for this steer, although this would be permissible in 1982. Another complaint was that the feed or rent had not been paid for, although this also would be permissible if there had been an agreement regarding payment. Another complaint about the Lomas steer was that Sherri Lomas did not know what the cost would be, although this information was provided to Mr. Kelsey by Mrs. Lomas, not Sherri Lomas. Another complaint was that Sherri Lomas went to the leader's house to lead the steer, although actually there would be nothing wrong with that, and in fact, it would be encouraged by 4-H. A second complaint related to the Koughn children. The complaint was that these steers had not been paid for,

nor the rent or feed, although this would be permissible as long as there was an agreement to pay. More complaints related to the steer owned by Kathy Fryman. One complaint was that the steer was at the leader's house, although this was permissible in 1982. Another complaint was that she had not paid for the steer, feed or rent, although this all would be permissible if there had been an agreement to pay for same. Another complaint raised was that Kathy Fryman would go to the leader's house and lead the steer, although this would actually be encouraged by 4-H. Besides excluding the Lomas, Koughn and Kathy Fryman steers, Eugene Kelsey testified that the steers of Micah Fryman, the Knakmuhs children, and Lori Myers, the other members of the Buccaneers Club, were excluded, too, without receiving any complaints as to their steers. The council had concern for the records of these steers, but they did not ask for records. The council did not know about these steers, but voted to exclude them anyway. The council did not even speak to the Knakmuhs family prior to the vote on Sunday to exclude the Knakmuhs' steer. One of the complaints, being keeping the steers at the home of Harold Fryman, was permissible for 4-H projects in 1982. Mr. Kelsey testified that at the subsequent council meeting on August 25, 1982, a suggestion was made that if a project was not on a child's property, they would have to come before the council and explain the situation. The council held another meeting on September 20, 1982, at which time a motion was passed providing that if a project carried by a 4-Her could not be kept on the premises, then the 4-Her, the parents and the leaders would report to the council and explain the details. This motion was passed after the 1982 fair. This type of situation was not prohibited during the 1982 fair. One of the three reasons the council voted to exclude the

steers of the Buccaneers Club was because the steers were not kept on the members' property, although the council did not have a rule prohibiting such action at the time. Patsy Michels, one of the council members, testified that she voted to exclude the projects from the fair, and part of her decision was based on the fact that she felt that the projects ought to be kept at the family's farm.

Another concern was for the price of the project. Eugene Kelsey testified that price arrangements that the Buccaneers had would have been permissible if they had an agreement for those price arrangements. Patsy Michels testified that part of her decision to exclude the steers was based on the fact that the steers and the feed were not going to be paid for until after the fair, although these arrangements were permitted in 1982. If the Claimants' parents and the club leaders had been open with the council and given the council the information on the payment agreement, this lawsuit might not have to have been filed.

Ross Helmy, the agricultural extension advisor for Edwards County in 1982, testified that in 1982, the council did not normally ask to see records before the fair had started. It was not a violation to keep steers at someone else's property as long as the members owned those steers. However, this was the element that led to the final decision of the council. This was permissible at the time of the fair in 1982, and afterwards, the council passed a resolution stating in the future, council approval would be required. It was permissible in 1982 to pay for a steer after the fair, as long as there was an agreement on the purchase of the steer. There was testimony that there was an agreement concerning payment for the steers and feed by the Buccaneers Club

members to Harold Fryman, the leader. The arrangements for purchase of the steers had been fully explained to all club members and all parents of club members at a club Christmas party in December of 1981. All members and parents were present with the exception of Mr. and Mrs. Lomas. Although they were invited to attend meetings, they never attended any meetings. All parents and club members were aware of the arrangements for the purchase of the steer projects with the exception of Mr. and Mrs. Lomas. The arrangements for the purchase and feed of the steer projects were the same for all members. Arrangements for payment of the feed after the fair, after the animal was sold, was not prohibited in 1982. However, it was one of the elements the council considered. Mr. Helmy did not remember club members Micah Fryman, Jeannine Knakmuhs, or Mike Knakmuhs, violating any rules with their beef projects in 1982. It was not a 4-H requirement in 1982 that if there was a problem with one project, all projects for that club had to be excluded from the fair. The council decided it did not have enough time to divide the good projects from the bad projects.

Donald Fryman testified that although there was concern over the project records, at no time did he ask to see these records. Martha Speir, the extension advisor, testified that neither she nor the council checked the records of any of the other clubs participating in the 1982 fair during the fair week. Jean Washburn, a member of the 4-H council, testified that she voted to exclude the steer owned by Micah Fryman because he was Harold's son and due to a question of records. However, she did not ask Micah or anyone else to produce Micah Fryman's records before she voted. She voted to exclude the steer of Mike Knakmuhs because he

was a leader's child and no other reason. She voted to exclude Jeannine Knakmuhs' steer because she was a leader's child and no other reason. Alice Hortin, a member of the 4-H council, testified that a consideration in her vote to exclude the steers on Sunday night was that some of the projects were kept at Harold Fryman's home. She considered that to be a violation of the 4-H rules. She didn't know if anyone on the council asked for clarification that night as to whether or not this would be a violation.

Mary Jane Bunnage, a council member, testified that Harold Fryman indicated at the Sunday night meeting that he felt that the projects were legitimate, but the council did not decide to investigate the matter further when they were advised of this. She did not investigate the matter further after the Sunday meeting. She felt that if the other children had irregularities, then Micah Fryman's steer was probably just like the others. She did not ask Micah Fryman about his steer project before she voted against it. The council did not inquire into Micah's factual situation before they voted. The council didn't ask Mike Knakmuhs or his parents about his project, and they didn't know if there were any problems with Mike Knakmuhs' steer. They knew of no problem with Jeannine Knakmuhs' steer on Sunday night. Jo Rector testified that she felt that the leaders of the club had a duty to perform and set an example, and even if the leaders' children's projects had been in compliance, those children should not have been allowed to show their projects either.

The 4-H council felt a serious problem had developed so they invited the primary leader, Harold Fryman, to come over from the fairgrounds to meet with the council, and see if the situation was as it

appeared to council members. The 4-H council minutes of Sunday night, July 18, 1982, state that Mr. Fryman "used a great deal of profane language while meeting with us." Mary J. Bunnage testified that Harold Fryman hit the west door "really hard," entered the room and came in using "quite a bit of profanity." 4-H extension council member Alice Horton testified that she would "never forget when he came in." She testified she did not know Harold until that time, but she turned around when he "stormed in the door cussing and carrying on and screaming and accusing." He accused the council of trying to get him. She testified that he refused to calm down and provide rational answers to questions posed. Mrs. Horton remembered saying after he left that she had never heard anyone use so much profanity in such a short period of time. He was there only about 30 minutes. Eugene Kelsey testified that there was a lot of swearing and the Buccaneers' leaders did not present themselves well. He testified that Harold Fryman did not provide answers to questions about the projects, but just swore. Agricultural extension advisor Ross Helmy testified that Harold Fryman was very emotional and "dropped on the council like a ton of bricks." His presentation was very unclear and he did not give any details about price, feed, or records. Several persons present remembered someone asking Harold Fryman to settle down, reminding him that there were ladies present and he should not use vulgar language, to which Harold Fryman remarked that there were not any ladies present.

Harold Fryman's brother, extension council member Don Fryman, testified that Claimant Harold Fryman came in cussing and would give no answers and no information on cost or other information showing legitimacy of the projects. He would not directly answer

the questions posed and he never mentioned any particular price for the steers.

Harold Fryman testified that Eugene Kelsey told him at the council meeting on Sunday, that Fryman had stolen money from the children. Jeannine Knakmuhs testified that council members told her that the children could no longer buy steers from Harold Fryman. She was told by a council member that she could not buy steers from Harold Fryman on either Sunday night or Monday night of the fair in 1982. After the 1982 fair, Harold Fryman did not sell any steers to children for 4-H projects. He attempted to sell steers but did not sell any. The last sale of 4-H steers that he had was in 1981 for the 1982 fair. He sold 10 head of steers for $500 each. Mr. Fryman had plans for the sale of steers after the 1982 fair, but he did not proceed with the sale. In 1982, Harold Fryman had approximately 192 head of cattle. He presently had about 20 head of cattle. Alice Horton testified that she did not even know Harold Fryman until he came into the meeting. She did not understand how the two small Koughn children living in town could care for 1,000-pound animals kept at Harold Fryman's farm, and it did not seem right for a 4-H leader to keep a bunch of steers for children to claim as projects when the children were not in possession of the projects, as required by the green book. Alice Horton testified that when she asked Harold how the children cared for the animals, Harold Fryman stated that "anyone could push a button," apparently referring to the automatic feeders where a person can push a button and an auger moves out a quantity of feed for the animals. Alice Horton further testified that there was no accusation from anyone that Harold Fryman was stealing money and no one prohibited Harold Fryman from selling projects to the children. She decided that if the projects were *bona*

*fide*, Harold Fryman would certainly have explained what was going on.

Based on the investigation made by the extension council and beef committee members, the projects did not appear to be proper and legitimate 4-H projects to the council. Jo Rector testified the council wanted desperately to clear the matter up because of its bad reflection on the 4-H. Agricultural extension advisor Ross Helmy testified the council was looking for evidence that these were legitimate projects and could find no evidence or signs that these were *bona fide* projects of Buccaneers club members. It did not appear that the steers actually belonged to the children, as required by the rules. Several steers were kept together, so it would be impossible to keep accurate records as to how much feed each steer project consumed. It was apparent that the children were not close to the projects and they did not know what the price was for anything and could not have the necessary records. The council felt that there was not any agreement concerning the price of the animals, feed, and stall rent. It did not appear that the children knew what the costs of the project were nor did it appear that they were caring for the animals. Council members testified that there did not appear to be any feelings of ill will toward Harold Fryman or the children members of the Buccaneers 4-H Club, and there were no accusations of anyone stealing or any prohibitions of children buying projects from Harold Fryman.

No evidence was presented to support the allegations that the council prohibited Harold Fryman from selling steers to 4-Hers. Alice Horton testified no one prohibited Harold Fryman from such sales.

As reflected by the July 18, 1982, minutes (Claim-

ant's Exhibit 2), after Harold Fryman met with the council, they voted to bar the Claimant children's steer projects as not proper and legitimate.

On Monday morning, July 19, 1982, the 4-H council had a meeting to reconsider the decision made the night before concerning the three steers of Micah Fryman, Jeannine Knakmuhs, and Mike Knakmuhs, who had done nothing wrong. Eugene Kelsey stated that Jeannine Knakmuhs made the statement that her mother was keeping records for the steers, but the council did not ask the parents or children for their records. He did not ask Micah Fryman for his records. Mrs. Knakmuhs did not indicate that she was keeping records for all the children. The 4-H extension council member, Glen Woodrow, testified that he asked a series of questions in an attempt to reevaluate the Knakmuhs and Micah Fryman steer projects. These questions related to the children's knowledge of their projects and animals. None of the children were able to tell what his or her animal weighed when acquired, nor what the animal was being fed. The primary Buccanneers leaders, Mr. and Mrs. Harold Fryman and John Knakmuhs, were not present for this meeting. Harold Fryman admitted that most of the children were there, but he was not present. Extension council member and secretary Mary Jane Bunnage testified that the children were rather unruly and generally announced that if one child could not show their steer, then none of them would show their steers. Jeannine Knakmuhs and at least one other child indicated that if any of the other children were excluded, none of them would show. Extension council member Glen Woodrow recalled several children saying that if one of them couldn't show, then none of them wanted to show.

Initially a majority of the council members at the Monday, July 19, 1982, meeting were in favor of permitting Micah Fryman and the Knakmuhs children to show their animals, since they had kept them on their home farms. Upon learning that Mrs. Knakmuhs kept the records for all of the children, and upon questioning the children and finding that they knew very little about their projects, the council then voted to exclude those three steer projects as well. At the time the council voted to exclude these three steers because of inadequate records, it was not required that records be checked before the project was exhibited. After the fair, on September 20, 1982, the council passed a rule that records for all projects had to be checked before the project was exhibited.

Lewis Stallings was another member of the Buccaneers Club in 1982, but his steer project was allowed to show in the 1982 fair. Lewis Stallings did not acquire his steer from Harold Fryman. However, Lewis Stallings did not keep his steer on his own property. He kept it at his grandparents' property. Lewis Stallings was able to show and sell his steer at the 4-H fair. Patsy Michels testified that Lewis Stallings' project was not brought before the council. She assumed that his steer was kept on his farm, and she did not know whether Lewis Stallings had his records in order. Don Fryman testified that Lewis Stallings was allowed to show his steer in the fair because it was at his grandfather's place, which was near to where Lewis lived. Don Fryman stated that Lewis Stallings' arrangement was no better than the arrangement that Mike Knakmuhs had with his steer. Don Fryman did not ask to see Lewis Stallings' records and did not know if those records were in compliance with 4-H requirements at the time of the fair.

John Knakmuhs testified that his wife, as leader of the Buccaneers Club, would help the members with their records at club meetings. She did not maintain and keep the records and she did not write information in the books. Mrs. Knakmuhs testified that only her children's record books were kept at her home. She would help children fill out the record books and she did not write anything in any of the record books. She felt that the record books of the children in the club were in order at the time of the fair but that no council member ever asked her if she kept or prepared any of the record books. Linda Koughn testified that her daughters kept their own records. Harold Fryman had signed each of the record books. Mr. Cal Cowsert, the regional director in charge of supervising the extension staff in Edwards County for the University of Illinois, testifying on behalf of the Respondent, testified that he was involved in the 4-H club in his area and that he would work with the children in his club with their record books and show them what to do. This help was entirely proper.

The steers of Jeannine and Mike Knakmuhs were both raised at their home. Both steers were ready and had been delivered to the fairgrounds prior to the fair. No council members asked to see the records on these steers and the records were ready by fair time. Jeannine and Mike Knakmuhs' steers were not allowed to show at the fair and did not sell at the fair. They sold at the local stockyard. Harold Fryman testified that he observed Mike Knakmuhs' steer when it was delivered to the fairgrounds in 1982, and it was in very good condition. Harold Fryman testified that Mike Knakmuhs' steer in 1981, which was champion in the lightweight class, was smaller, shorter in length, and shorter in height than his 1982 steer. Harold Fryman testified that Jeannine Knakmuhs' steer in 1982 was a good-sized steer and had

favorable characteristics as to height and length. The steer she had in 1982 was a lot bigger than the steer she had in 1981, which had won a champion prize. Weight is one of the considerations made in an animal's placing in the fair. The reserve champion that Jeannine had in 1981 weighed 1,050 pounds. Jeannine's steer in 1982 weighed 1,100 pounds. Jeannine Knakmuhs' steer would have done very favorably in the fair in 1982. Her steer would compare closely to the top steers.

The steer projects for Anna Koughn and Christina Koughn were not allowed to show at the fair and they did not sell at the fair auction. They also sold at the local stockyard. These steers remained at Harold Fryman's property. These steers were ready to be shown at the fair. No one asked to see records for these steer projects and the records were ready. Harold Fryman testified that these steers were healthy, not wild, and had been delivered to the fairgrounds prior to the fair. Harold Fryman did not feel that these steers would have won top awards at the 1982 fair, but they would have sold at the fair auction.

The steer project for Micah Fryman was not allowed to show at the 4-H fair. It did not sell at the auction. It, too, sold at the local stockyard. This steer project was kept at Micah's home and the steer was ready to be shown. It had been delivered to the fairgrounds. No one asked Micah for his records on the project and the records were ready. Harold Fryman testified that Micah's steer in 1982 would have compared favorably with the top steers that won awards. The steer that Micah was planning to show in the 1982 fair was a champion at a show in Carmi, Illinois, the month before the Edwards County fair.

Ross Helmy testified that after the fair, he and

Martha Speir went to the Buccaneers Club and asked to see the books and records, but the records were not provided. Jeannine Knakmuhs admitted that she did not turn in her records for her project and club records for the year 1982. Martha Speir, home extension advisor, testified that no records were turned in for any of the Claimants' projects for 1982, even though there were awards and prizes available for recordkeeping.

Two project books for the Koughn children were submitted as evidence at trial.

The importance of refusing to allow the children to show their steer projects was that the steers could not be sold at the fair auction. The annual 4-H stock sale held in the week after the 4-H show, gives 4-H club members with steer projects a chance to sell their animals for more than the fair market value. Bankers, feed stores, other businesses in the area and relatives come and bid on the animals, customarily in excess of the fair market price. Members of the business community feel they are helping 4-H children who raise stock projects. If the information that these steers were not legitimate projects but were actually animals of Harold Fryman became public information, the stock sale would be jeopardized. This was discussed at length at the Sunday night, July 18, meeting.

Ross Helmy testified that at the 1982 steer auction, all of the eligible steers, other than the Buccaneers' steers, were sold at the auction. He stated that the price brought at the 4-H auction is normally higher than the price brought at a normal sale through the stockyard. Mr. Helmy could not recall any times where a child sold an eligible steer at the auction where no one bid on the steer. If that happened, the steer would sell at the local stockyard for the market price. Steers sold at the auction

always bring more money than what the stockyard pays. Mr. Helmy stated that of all the steers sold at the 1982 fair auction, the lowest selling steer sold for $721. The only Buccaneer allowed to sell at the sale was Lewis Stallings, and his steer sold for $908. Glenn Woodrow testified that the total average of the auction in 1982 was higher than it had been before or since.

John Knakmuhs testified that the steers for his children in 1982 were better than the steers that they had in 1981. Jeannine Knakmuhs testified that her steer in 1982 was built better and looked better and weighed more than her steer in 1981. In 1981, her steer won reserve champion and sold for $1,021.51. In 1980, her steer had won grand champion. Micah Fryman testified that he had entered his 1982 steer in other competitions that year and that that steer was a champion steer in that competition and he had won a trophy. This is the same steer that was not allowed to show at the Edwards County fair. Mike Knakmuhs testified that in 1981, his steer won lightweight champion at the Edwards County fair. In 1982, his steer was not allowed to show at the fair. It sold at the stockyards for $593.60. In 1981, his steer sold at the fair for $935.75. His steer in 1981 weighed 985 pounds. His steer in 1982 weighed 1,060 pounds.

The Claimants who could have shown their steers at the fair but for the council's decision, sold their steers at the local stockyard. Anna Koughn sold her steer for $580. Christina Koughn sold hers for $544.50. Jeannine Knakmuhs sold hers for $616. Micah Fryman sold his steer for $635.10 and Mike Knakmuhs sold his steer for $593.60. The steers weighed as follows: Anna, 965 pounds; Christina, 990 pounds; Jeannine, 1100 pounds; Micah, 1095 pounds; and Mike, 1060 pounds. The

average price for the steers that sold at the 1982 Edwards County 4-H auction was more than $1.06 per pound. The minimum sale price was $.70 per pound. The premium money for a champion steer would not be more than $10 or $12 in the 4-H program. The big money to be paid on a steer project is if you can sell it at the 4-H auction and get some merchant or banker to pay $500 or $1,000 more than the stockyard price.

Harold Fryman stated that the two steers for which records were submitted, the projects of Christina and Anna Koughn, were "B" quality steers and were not the best of the steers. Harold Fryman testified that he had an agreement with the child where he would receive $550 for the animals and the feed, each. The animals cost him about $250 to $275 and the basic feed cost was approximately $250, so that with the other expenses, he would not make a profit from the projects. With regard to the steers kept as projects for the two Koughn children and Sherri Lomas, Harold Fryman voluntarily waived the right to the $50 reimbursement for feed and was paid only for the steer. With regard to the steers of Kathy Fryman and Lori Myers, the steers were butchered and Harold Fryman and each family received half of the beef. There was no testimony as to the fair market value of the dressed, processed and packaged beef. There was also no testimony offered indicating what the Buccaneers' steers would have sold for had they been allowed to sell at the 4-H auction.

Claimants' steers that were not butchered by the owners were sold to the stockyards for the fair market value. There was no proof offered as to what they would have brought had they been bought at the 4-H auction by any potential bidder.

Harold Fryman made reference to the possibility of

selling animals to the 4-H club members in future years, but no evidence was presented as to what the animals would cost, what he would have received, or what profits might be derived from the transaction by him. No proofs were offered that Harold Fryman had ever made a profit in the cattle business or would seek a profit on 4-H projects.

A further meeting was held by the council on August 25, 1982. The club members were invited to join other 4-H clubs as the Buccaneers Club was voted out of existence after a stormy meeting.

The University of Illinois is by law authorized to provide for county extension councils and issue guidelines and procedures concerning operations, and is authorized to plan extension education programs including 4-H club work. The *Guide to County Extension Councils* describes the functions of county extension councils. An important function is to cooperate with extension personnel in planning an educational program in agriculture, home economics, 4-H and youth community resource development, and subjects relating thereto. Respondent's Exhibit 7 describes projects and activities and states the purpose of 4-H projects and activities. 4-H members are to select at least one project and complete one or more learning goals related to the project during the year. The 4-H council necessarily has the authority to set out guidelines for competition. The project leader should help the 4-H member select materials or animals and teach them the knowledge and skills needed to conduct the project. The beef manual, Respondent's Exhibit 3, gives guidance to a youngster on raising and caring for a beef animal. The leader's handbook describes some show requirements for a beef animal, including that the animal must be owned by the member.

The Edwards County 4-H project and activity book for 1982 county shows, titled "Pass It On," admitted as Respondent's Exhibit 5, states that the duties of the 4-H council include analysis and determination of county events. General Rule 3 states that project exhibit requirements will be set up annually by the 4-H council and will be determined by the requirements of the project books. General Rule 5 provides that no club member may exhibit any animal or article which is not part of his or her 4-H project. General Rule 6 requires record books on projects be up to date. General Rule 9 requires that all 4-H projects must be shown on the date of the 4-H show or no prize money will be received. General Rule 25 states that in the event of any disputes or unforeseen circumstances, the 4-H council shall make the official ruling. General rules with regard to the show or fair, set out on page 19, include that animals that cannot be led into the ring may not receive any premium or prize money. The general rules as set out in the green book state that all beef and steer projects must be in the possession of the club member by January 1 in order to show and sell at that year's 4-H show. The 4-H council also has the authority to change the rules.

## The Law

It is clear that Claimants Kathy Fryman and Lori Myers have no cause of action since the evidence is uncontroverted that they could not have shown their steers at the 1982 Edwards County fair because of wildness in the one case and disease in the other case. The remaining Claimants claim that the extension council tortiously interfered with their business relationships in that the council conducted a woefully inadequate investigation and then wrongfully barred the

Buccaneers Club members, except Lewis Stallings, from showing their steers at the county fair. By the council's ruling, the Claimants were denied the opportunity of putting their steers up for bid at the 4-H auction and had to sell their steers at the local stockyard for fair market value, and were denied the chance of receiving a higher amount based on the bidding of merchants and relatives.

Both the actions of the council and Harold Fryman's reactions thereto and his actions as leader led to the punishment of the children Claimants herein. It is a shame that they missed out on a chance to reach the lofty goals of 4-H. Instead, they saw the results of the pettiness of men at its worst.

Unfortunately, this punishment does not lead to a recovery under the law. Claimants allege that the Edwards County 4-H council conspired to maliciously injure the Claimants. The theory of Claimants is that Respondent tortiously interfered with Claimants' business relationships.

All parties agree that the elements of the tort of tortious interference with a business relationship include:

(a) The existence of a valid business relationship or expectancy;

(b) Knowledge of the relationship or expectancy on the part of the interferer;

(c) An intentional interference inducing or causing a breach or termination of the relationship or expectancy;

(d) Resultant damage to the party whose relationship or expectancy has been disrupted. The interest

protected is the reasonable expectation of economic advantage. *Zamouski v. Gerrard* (1971), 1 Ill. App. 3d 890.

The Claimant must prove each and every element and his or her damages by a preponderance of the evidence to prevail.

Illinois law requires the interference to be intentional, unjustified, and malicious. If the interference is justified or with just cause, the interference is not actionable. (*Audition Division, Ltd. v. Better Business Bureau* (1983), 120 Ill. App. 3d 254; *Getschow v. Commonwealth Edison* (1982), 111 Ill. App. 3d 522; *Crinklev v. Dow Jones & Co.* (1978), 67 Ill. App. 3d 869.) It is also the law of Illinois that as the degree of enforceability of a business relationship decreases, the extent of permissible interference increases. *Belden Corp. v. Internorth Inc.* (1980), 90 Ill. App. 3d 547.

Claimants appear to fail at the outset on element (a), because it would appear that the 4-H beef projects are not a business. The steer project for each child is supposed to be an educational experience. All of the extension council members serve without pay. The leaders of the club serve without pay. Claimant Harold Fryman testified he was not making a profit out of the sale of the steers to the children. It would appear from the testimony that, at best, he broke even and probably took a loss on each steer. His reward was the teaching of the 4-H club members. On element (b), the Claimants also fail. While the council members had knowledge of the 4-H auction, it is a fair finding that none of the council members considered 4-H a business consisting of business relationships.

Element (c) is not as clear cut because of the nature of the investigation as it affected the children. However,

there is no question that the 4-H council had the power to disqualify an entire club should it choose to do so and there was no business to interfere with. There was enough reasonable cause to draw the projects into question. Harold Fryman's actions at the Sunday meeting as leader and his failure to attend the Monday morning meeting under the time constraints of the beginning of the fair make the council's decision more palatable. The council can make, change and enforce the rules as they see fit. It cannot be said that the council acted maliciously as a matter of law.

The Claimants fail completely on element (d). They have not proven damages as is their burden. (*Rivera v. Illinois* (1985), 38 Ill. Ct. Cl. 272.) For their failure to prove damages alone, the claims of each Claimant should be denied. Harold Fryman failed to prove any present loss, any loss for future years, or any contracts or business he lost. He presented no proof of any business relationships wherein he suffered any loss of profit or that anyone refused to deal with him because of the actions of the 4-H council. The council members testified no one told him he could not sell beef projects to 4-H clubs. The children who would have been able to show their steers, but for the actions of the council, each sold their steers at fair market value. No proof was presented by anyone that they would have paid more at the auction. To guess what would have been bid at an auction where goodwill is the incentive is too speculative. The children had only a mere expectancy of gain. (*Beldon Corp. v. Internorth Inc.* (1980), 90 Ill. App. 3d 547.) While damages may be inferred in this type of case, here it is just too speculative. *Getschow, supra.*

Respondent raises the affirmative defense that the Edwards County extension council's actions were all

discretionary official actions and therefore privileged conduct not actionable in tort. The State only incurs liability when the acts complained of are ministerial and not discretionary. *Rosenbaun v. State* (1975), 30 Ill. Ct. Cl. 560.

The Court does not have to reach this issue because Claimants have failed to prove the elements of intentional interference with business interests. However, it appears the council was acting in its discretion, however inanely this was done. As long as their actions did not rise to the level of maliciousness, which is the case with the council, then such actions are not actionable and are privileged. *Audition Division, Ltd. v. Better Business Bureau* (1983), 120 Ill. App. 3d 254.

It is therefore ordered, adjudged and decreed that the claims of each Claimant be denied.